Cristabel PROVIDENCE, Plaintiff,

v.

HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY, Defendant.

No. 8:03CV2500T27TGW.

United States District Court, M.D. Florida, Tampa Division.

Jan. 12, 2005.

---

Paul S. Kimsey, Kimsey Law Group, Tampa, FL, for Plaintiff.

Ralph C. Losey, Katz, Kutter, Alderman & Bryant, P.A., Orlando, FL, for Defendant.

### ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

WHITTEMORE, District Judge.

In this action, Cristabel Providence ("Plaintiff") sued Hartford Life and Accident Insurance Company ("Defendant"), alleging that Defendant wrongfully denied her claim for long term disability benefits in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). (Dkt. 1). Before the court is Defendant's Motion for Summary Judgment (Dkts. 15, 16 and 17) and Plaintiff's Response to Defendant's Motion for Summary Judgment (Dkt. 20). Upon consideration, Defendant's Motion for Summary Judgment is **GRANTED**.[1]

### Factual Background

Plaintiff was employed as an IS Help Desk Specialist by Quality Distribution, Inc. on July 13, 1998. (Dkt. 17, Ex. A–14, A.R.320).[2] Plaintiff provided telephonic

---

1. Defendant correctly points out that its motion, although styled as a summary judgment motion, is more correctly construed as a motion for final judgment, given the nature of challenges to benefit determinations under ERISA. In ERISA cases, the district court sits more as an appellate tribunal than as a trial court. Typically, a review of the benefit decision is made by the district court based on the administrative record available to the decision maker at the time of the decision. Evidence is rarely taken and therefore the usual tests for summary judgment, such as whether genuine issues of material fact exist. do not apply. *See Bendixen v. Standard Ins. Co.,* 185 F.3d 939, 942 (9th Cir.1999).

2. The parties agree that the claims file attached to Defendant's motion for summary judgment (Dkt. 17, Exs. A–1 through A–18) represents the administrative record relevant to Plaintiff's claim. Documents within the administrative record will be identified as "A.R." followed by the bates number at the bottom of the document.

technical support to customers. Her position required continuous sitting and frequent use of a computer keyboard. (A.R. 321) Plaintiff participated in Quality Distribution's Group Long Term Disability Benefits Plan ("the Plan"). The Plan is funded through a policy issued by Defendant, which also functions as claims administrator.

In July, 1999, Plaintiff began experiencing a variety of symptoms, including pain in her neck, face, underarms, wrists and hips, headaches, fatigue, depression, and difficulty sleeping and concentrating. (A.R.102) She first complained of these symptoms to her treating physician, Dr. Pila in August, 1999. (*Id.*) At that time, Dr. Pila made a potential diagnosis of fibromyalgia and prescribed several medications.(The note stated: "A:? Fibromyalgia?") Plaintiff returned to Dr. Pila in October, November and December complaining of the same symptoms and side effects from the medications. (A.R.103–05) Dr. Pila made a diagnosis of Fibromyalgia in November, 1999, but noted only one tender point. (A.R.103) He noted one or two tender points in December but made no tender point findings in February and after an office visit on March 7, 2000. (A.R.104–05). During a March 20, 1999 visit, Dr. Pila noted 8 diagnostic tender points.[3]

Plaintiff took a leave of absence from work under the Family and Medical Leave Act from February 14, 2000 through May 7, 2000. In his notes regarding Plaintiff's March 7, 2000 office visit, Dr. Pila approved her leave for one additional month. (A.R.105) On May 9, the day after she returned to work, Plaintiff again saw Dr. Pila in his office. She complained of pain and also stated that she "was told if she took any more time off work for Dr.'s

appointment she would be fired." (A.R. 107) During that visit, Dr. Pila noted in Plaintiff's file "OK to work." (*Id.*) .

On May 9, Plaintiff also had her first appointment with Dr. Winters, a neurologist. (A.R.177–79) Dr. Winters diagnosed Plaintiff with muscle contraction headaches, prescribed additional medication, and ordered testing. (*Id.*) Plaintiff returned to Dr. Winters's office in June after an MRI was completed, the results of which were normal. (A.R.180–81). Dr. Winters affirmed his diagnosis of muscle contraction headaches, adding that she also suffered occasional migraines. (A.R. 180). He adjusted her medications and told her to return in two months. (A.R. 181). .

Also in May, Plaintiff had her first visit with a rheumatologist, Dr. Germain. (A.R. 165) Dr. Germain ordered numerous tests and saw Plaintiff again in early June. In his letter to Plaintiff's treating physician, Dr. Germain summarized Plaintiff's symptoms and test results and stated that he could "not put this together into a definitive diagnosis". He made no treatment recommendations and placed no restrictions on Plaintiff. (A.R.156) In early June, Plaintiff saw Dr. Andersen for an evaluation of a nevus on her left check and subcutaneous nodules which had been noted by Drs. Pila and Germain. (A.R.189) Dr. Andersen order a biopsy of the nevus, made no other treatment recommendations, and noted that Plaintiff "appear[ed] to be in good health."

On May 19, 2000. Plaintiff resigned. Thereafter, she filed a claim for long term disability benefits under the Plan. Defendant reviewed the medical records submitted by Plaintiff and determined that she had not established that she was disabled

---

**3.** The parties agree that the American College of Rheumatology criteria for a definitive diagnosis of fibromyalgia requires objective findings of tenderness at 11 or more of 18 specific sites.

as of the day she terminated her employment. (*Id.*) On January 29, 2003, Defendant denied benefits after reviewing Plaintiff's final appeal. (A.R.381–83) Defendant further concluded that any disability arising subsequent to May 22, 2000 was not covered by the Plan since she had resigned and therefore was no longer insured. (*Id.*)

### The Plan

In pertinent part, the Plan provides:

"**Who is eligible for coverage?** ... All active Full-time Employees," defined as employees working at least "35 hours weekly." (A.R.395)

"**When does your coverage terminate?** You will cease to be covered ... the date you cease to be an Active Full-time Employee." (A.R.403)

"**Disability or Disabled** means that during the Elimination Period and for the next 24 months you are prevented by ... sickness... from performing one or more of the Essential Duties of Your Occupation, and as a result your Current Monthly Earnings are no more than 80% of your Indexed Pre-disability earnings." (A.R.397)

"Essential Duty means a duty that:

    1.  is substantial, not incidental;

    2.  is fundamental or inherent to the occupation; and

    3.  cannot be reasonably omitted or changed.

To be at work for the number of hours in your regularly scheduled workweek is also an Essential Duty." (A.R.397)

"**When do benefits become payable?** You will be paid a monthly benefit if:

    1.  you become disabled while insured under this plan;

    2.  you are Disabled throughout the Elimination Period;

    3.  you remain Disabled beyond the Elimination Period;

    4.  you are, and have been during the Elimination Period, under the Regular Care of a Physician; and

    5.  you submit Proof of Loss satisfactory to us."

(A.R.404)

### Standard of Review

ERISA does not provide a standard of review for decisions by a plan administrator or fiduciary in actions challenging benefit determinations under § 1132(a)(1)(B). *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 108–09, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Paramore v. Delta Air Lines,* 129 F.3d 1446, 1449 (11th Cir.1997). The Supreme Court has established that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Bruch,* 489 U.S. at 115, 109 S.Ct. 948.

Here, the parties agree that the Plan vests discretion in Defendant as the administrator to determine eligibility and interpret the terms and provisions of the Plan. (A.R.404). Accordingly, the arbitrary and capricious standard applies to a review of the administrator's decision, absent a conflict of interest, whereupon a heightened arbitrary and capricious standard applies. *See Williams v. BellSouth Telecommunications, Inc.,* 373 F.3d 1132, (11th Cir.2004). Where, as here, the plan administrator acts as the insurer of the plan, the heightened arbitrary and capricious standard applies. *Id.* However, the fiduciary's decision must be 'wrong' from the perspective of *de novo* review before the self interest of the fiduciary is considered. A decision is 'wrong', if after reviewing the record and plan documents de novo, the court disagrees with the administrator's interpretation of the plan. *See*

*HCA Health Services of Georgia, Inc. v. Employers Health Insurance Co.*, 240 F.3d 982, 995 (11th Cir.2001); *Williams v. Bell-South Telecommunications, Inc.*, 373 F.3d at 1137–38. If this court does not disagree with the administrator, the inquiry ends. *Id.*

### Discussion

■ While the parties place some emphasis on whether and when Plaintiff was actually diagnosed with fibromyalgia, the operative inquiry is whether Plaintiff was disabled within the meaning of the Plan's language as of the date of her resignation. Under the relevant provisions of the Plan, Plaintiff was not eligible to receive disability benefits unless she was prevented by her illness "from performing one or more of the Essential Duties" of her occupation. Defendant denied Plaintiff benefits because it concluded that Plaintiff's medical records did not support restrictions or limitations which would prevent Plaintiff from performing her position as an IS Help Desk Specialist. After a *de novo* review of the administrative record, this Court concludes that Defendant's interpretation and decision to deny benefits was not wrong.

Plaintiff saw four different physicians in the weeks prior to and after her resignation. None of those doctors made any notation that she was unable to work or medically restricted from doing so. The physicians' office notes merely document Plaintiff's self-reported symptoms and contain numerous test results, most of which were normal. Significantly, Plaintiff's treating physician noted "OK to work" in her file less than two weeks before her resignation.

The only physician to state that Plaintiff was unable to work because of her illness was made by Dr. Creighton, who first examined Plaintiff on June 4, 2002, more than two years after her resignation. While Dr. Creighton's "comprehensive review of Ms. Providence's medical records" may have "establish[ed] an unbroken timeline of medical treatment" (Dkt. 20 at 4), she opined only that Plaintiff "*is* unable to work in any type of position due to these multiple medical problems". The doctor did not attempt to offer an opinion as to whether Plaintiff was similarly restricted two years earlier (A.R. 364; emphasis added)..

Contrary to Plaintiff's assertion, Defendant's failure to request an independent medical examination does not render its decision wrong or unreasonable. Plaintiff bore the burden of submitting "Proof of Loss satisfactory to" Defendant in order to establish eligibility for benefits. (A.R.404). Plaintiff failed to submit a single contemporaneous medical opinion that she was unable to perform the requirements of her job due to her illness. Defendant is not required to have ordered an independent medical examination when Plaintiff's own doctors did not find that she was unable to work.

After a *de novo* review of the claims file, this Court cannot conclude that Defendant was wrong in its determination that Plaintiff's medical records do not support a finding that Plaintiff suffered from a condition severe enough to prevent her from performing the Essential Duties of her sedentary position. As a result, Defendant's denial of benefits is affirmed. Accordingly, it is

**ORDERED AND ADJUDGED** that:

1. Defendant's Motion for Leave to File Reply Memorandum (Dkt. 21) is **GRANTED.**[4]

---

4. Ordinarily, consistent with the Local Rules, this court discourages replies, particularly where, as here, the defendant has taken some liberty with the Local Rule page limitation to file a *19 page* motion and *20 page* memorandum in support. Moreover, Defendant seeks leave to file an additional *16 page* reply.

2. Defendant's Motion for Summary Judgment (Dkt. 15) is **GRANTED**. Judgment shall be entered in favor of Defendant and against Plaintiff.

3. The Clerk is directed to close this case and deny as moot any pending motions.

Counsel are reminded that the Local Rules prohibit pleadings in excess of 20 pages and do not authorize a combined 39 page motion and memorandum. Future filings are subject to being stricken.

Notwithstanding, a review of Defendant's reply assisted the court in analyzing troubling disputes between the parties as to what the administrative record showed and just as importantly, did not show.