[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
Oct. 27, 2009
THOMAS K. KAHN
CLERK

_____

No. 09-11748
Non-Argument Calendar

_____

D. C. Docket No. 07-01737-CV-CC-1

TRINA GIPSON,

Plaintiff-Appellant,

versus

ADMINISTRATIVE COMMITTEE OF DELTA AIR LINES, INC.,
THE DELTA FAMILY-CARE DISABILITY AND SURVIVORSHIP
PLAN,
AETNA LIFE INSURANCE COMPANY,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(October 27, 2009)

Before CARNES, WILSON and KRAVITCH, Circuit Judges.

PER CURIAM:

Trina Gipson appeals the district court's grant of summary judgment in favor of Delta Airlines' Administrative Committee ("the Committee") in her civil action seeking benefits due under the Delta Family-Care Disability and Survivorship Plan. Gipson argues that the district court erred by (1) requiring objective findings to support her disability; (2) improperly giving more weight to the opinion of a one-time examining consultant; (3) failing to consider as evidence the prior award of disability benefits; and (4) improperly refusing to consider additional evidence submitted. After a thorough review of the record, we affirm.

I. Background

The Delta Family-Care Disability and Survivorship Plan ("the Plan") is an employee benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA") and provides short-term and long-term disability to non-pilot Delta employees. The Committee is the Plan Administrator, although the Committee delegated the initial benefits determination to Aetna Life Insurance Company ("Aetna"). Under the terms of the Plan, a claimant is entitled to long-term disability if she "is disabled at that time as a result of demonstrable injury or disease (including mental or nervous disorders) which will continuously and totally prevent [her] from engaging in any occupation whatsoever for compensation or

profit, including part-time work." Plan § 4.03. If benefits are denied by Aetna at the initial level, a claimant can seek review from the Committee.

Gipson worked for Delta as a reservation agent until April 1995, when she requested and received short-term disability benefits due to fibromyalgia, depression, and headaches. In October 1995, she began to receive long-term disability benefits.

In 2001, the Plan transferred review of Gipson's case to Aetna, which initiated a reassessment and traced Gipson's medical history. Aetna continued to gather medical information over the next few years until it denied long-term disability benefits in 2004.

The medical records Aetna reviewed to make this determination are as follows: In 1996, Gipson was seen by Dr. Patricia Donley, a psychiatrist, who concluded that Gipson was suffering from depression, headaches, and drug-induced arthritis. She opined that Gipson would be unable to work indefinitely, but that her prognosis was excellent and it was likely she would be able to return to work at a later date. That same year, Gipson also began seeing Dr. Frederick McDuffie for pain, fatigue, headaches, and depression. McDuffie indicated that Gipson was unable to continue her past work and was unlikely to be able to engage in other employment. McDuffie continued to treat Gipson over the next few years

3

and referred her to physical therapy and a psychologist.

In 1997, under section 4.05 of the Plan, Gipson was evaluated by Dr. H.A. Selvey, a psychiatrist, who opined that Gipson was exaggerating her symptoms and did not appear to suffer any injury or disease that would qualify her as disabled. The Plan also hired an investigator to conduct surveillance. After observing Gipson over several weeks, the investigator informed the Plan that he found nothing showing that Gipson was active outside her apartment.

In 1999, Gipson began seeing Dr. Rantandeep Singh, a rheumatologist. Dr. Singh indicated that Gipson was totally disabled and excluded from even part-time employment. He advised her to seek psychotherapy and referred her to Dr. Chris Riddell. Singh also advised her to begin an exercise program, and Gipson later reported that she had started yoga. In 2000, Dr. Riddell informed Singh that he had seen Gipson, but that Gipson was refusing psychotherapy and medication. Gipson continued to see Singh for treatment, and although Singh would refill her medications, Gipson refused to try other medications and antidepressants.

In 2003, Gipson reported that the yoga and pain medications made her feel better. She also received a psychological evaluation from Dr. Valerie McAdams, who opined that Gipson's depression made it unlikely that she could be a productive employee at that time. As a result, she obtained Social Security

4

disability benefits.

In response to Aetna's request for medical records, Singh submitted statements dated January, July, and November 2003, advising that Gipson suffered from fibromyalgia and required rest. He opined that she was fully disabled and could not work.

In 2004, Gipson was referred for an Independent Medical Examination ("IME") with Dr. Michael Friedman. According to Dr. Friedman, Gipson suffered from, among other ailments, chronic pain syndrome, migraines, and coronary artery disease. Friedman also conducted a functional capacity test, concluding that Gipson could occasionally lift, push, pull, carry, bend, and twist; could grasp objects and conduct fine manipulation; could occasionally walk and stoop; and could frequently sit and stand. He found that Gipson was capable of lifting one to five pounds frequently and could occasionally lift up to ten pounds. Accordingly, Friedman opined that there was nothing to preclude Gipson from returning to part-time sedentary work up to four hours a day provided she received time off due to headaches. He further suggested that she seek evaluations from a neurologist and psychiatrist.

During this time, Aetna also conducted another period of surveillance; the the investigator observed Gipson driving her car, walking with a normal gait, and

5

showing no signs of discomfort entering or exiting her car. The investigator followed Gipson to the grocery store, where Gipson was seen carrying grocery bags in each hand and transferring the bags between hands.

In 2004, Singh submitted a letter stating that he had been treating Gipson for five years for fibromyalgia and depression and that she was unable to work on even a part-time basis. He explained that he had advised her to follow up with psychotherapy treatment.

After Aetna terminated Gipson's long-term disability benefits in 2004, Gipson sought review with Aetna and then with the Committee. Prior to the Committee meeting, Gipson was notified by letter that she should submit any additional information to support her claim. She apparently did not submit any further medical documentation.

In March 2005, the Committee upheld the denial of benefits. The Committee did not dispute the medical diagnoses, but concluded that the severity and effect of these medical issues did not establish an inability to work. The Committee considered the records submitted from Selvey and Friedman, the 1996 statement from Donley, the records from McDuffie dated February and May 1997, and the following information from Singh: (1) the questionnaire dated September 2003; (2) provider statements dated January, July, and November 2003; (3) office

notes dated January, May, August, and December 2003; and (4) the April 2004 letter to Aetna. The Committee also reviewed McAdams's evaluation and Riddell's notes, as well as the surveillance conducted. Based on these records, the Committee concluded that Gipson had not shown that she was disabled and unable to engage in any part-time work. The Committee noted that Singh's reports were brief and conclusory, with no detailed explanation of his findings. The Committee considered Gipson's refusal to comply with Riddell's suggested treatment of medication and psychotherapy. Reviewing Friedman's conclusions, the Committee noted that Friedman "determined unequivocally that [Gipson was] immediately capable of part-time sedentary work." The Committee concluded that, even if the records established a disability warranting benefits, Gipson's failure to follow the prescribed treatment plans rendered her ineligible for benefits under the Plan.[1]

---

[1] In February 2007, after the Committee completed its review, Gipson notified Aetna that she wished to submit additional information from Dr. Singh. This additional information included a March 2006 questionnaire in which Singh opined that Gipson was "incapable of even 'low stress jobs,'" and could sit for only one hour and stand for only twenty minutes at a time. He indicated that she could lift less than ten pounds, rarely, and never lift more than that. She was unable to twist, crouch, or climb and had significant limitations on reaching and handling. He stated that she simply could not work. Gipson also included notes from Singh from 2004 through 2006 confirming her fibromyalgia and pain. In 2006, she visited Dr. Gandy, a cardiologist, who found that Gipson had coronary artery disease and who agreed with Singh's prognosis and limitations. Apparently, however, Aetna had erroneously informed Gipson that she could seek additional appeals through Aetna following the Committee's denial of benefits. Aetna later advised Gipson that this had been an error and that the appeals process provided under the Plan had been exhausted. It is these additional documents that Gipson now seeks to admit.

Gipson then filed the instant ERISA action. Both parties filed motions for summary judgment. Gipson's motion included additional materials not presented to the Committee. The Committee therefore opposed the admission of these records.

The district court granted the Committee's summary judgment motion. The district court first determined that it would not consider materials not presented to the Committee. The court then concluded that the Committee's decision was not "wrong," as Gipson had not shown she was entitled to benefits. The court reviewed the medical records and agreed that Singh's reports were conclusory and lacked any objective findings to support the conclusion that Gipson was unable to work. The court also concluded that the fact that Gipson received Social Security benefits was not dispositive because the rules applicable to such determinations did not apply to ERISA claims. This appeal followed.

III. Standards of Review

We review a district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the party opposing the motion. Skrtich v. Thornton, 280 F.3d 1295, 1299 (11th Cir. 2002). We review evidentiary rulings for abuse of discretion. Wright v. CSX Transp., Inc., 375 F.3d 1252, 1260 (11th Cir. 2004). Where, as here, an ERISA plan endows the plan administrator with

discretion to determine eligibility for plan benefits, we review the administrator's

decision under a deferential standard. Firestone Tire and Rubber Co. v. Bruch, 489

U.S. 101, 111, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). We will reverse the plan

administrator's decision only if it was arbitrary and capricious.[2] Paramore v. Delta

Air Lines, 129 F.3d 1446, 1449 (11th Cir. 1997).

In evaluating whether a decision was arbitrary and capricious, we apply a

multi-step analysis:

> (1) Apply the de novo standard to determine whether the claim
> administrator's benefits-denial decision is "wrong" i.e., the court
> disagrees with the administrator's decision); if it is not, then end the
> inquiry and affirm the decision.
> (2) If the administrator's decision in fact is "de novo wrong," then
> determine whether he was vested with discretion in reviewing claims;
> if not, end judicial inquiry and reverse the decision.
> (3) If the administrators decision is "de novo wrong" and he was
> vested with discretion in reviewing claims, then determine whether
> "reasonable" grounds supported it (hence, review his decision under
> the more deferential arbitrary and capricious standard).
> (4) If no reasonable grounds exist, then end the inquiry and reverse
> the administrator's decision; if reasonable grounds do exist, then
> determine if he operated under a conflict of interest.
> (5) If there is no conflict, then end inquiry and affirm the decision.
> (6) If there is a conflict of interest, then apply heightened arbitrary and
> capricious review to the decision to affirm or deny it.

Doyle v. Liberty Life Assurance Co. of Boston, 542 F.3d 1352, 1360-61 (11th Cir.

2008) (upholding a district court's analysis following the above steps after Metro.

---

[2] The parties do not dispute that this is the proper standard.

9

Life Ins. Co. v. Glenn, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008)).  Gipson bears the burden of proving that she was disabled under the terms of the Plan.  Horton v. Reliance Standard Life Ins. Co., 141 F.3d 1038, 1040 (11th Cir. 1998).

IV. Discussion

Gipson raises four challenges to the district court's decision.  We first address the evidentiary issue and then turn to the merits.

A. Additional Evidence

Gipson asserts that she was entitled to submit additional medical evidence relevant to her medical condition because those reports were submitted to Aetna.

We agree with the district court that the additional evidence was not properly before it.  Our law is clear; even under the first step of the analysis, where the court determines whether the administrator was wrong under a "de novo" standard, "[w]e are limited to the record that was before [the administrator] when it made its decision." Glazer v. Reliance Standard Life Ins., 524 F.3d 1241, 1247 (11th Cir. 2008).  Thus, the district court properly rejected the additional evidence Gipson submitted.

B. Objective Medical Evidence

Gipson argues that she was not required to provide objective medical evidence under the terms of the Plan, and that the evidence she submitted

established her disability.

Although Gipson is correct that nothing in the Plan required objective medical evidence, our review of the record establishes that the district court did not require objective medical evidence of a disease. The district court accepted the medical diagnoses but found that Gipson's illnesses did not explain the limitations identified by Dr. Singh. The court noted that Singh's opinion was conclusory and offered no explanation for his findings that Gipson was unable to engage in any work.

In our de novo review, we turn first to the plan itself. See 29 U.S.C. § 1104(a)(1)(D) (providing that an ERISA plan administrator must "discharge his duties with respect to a plan . . . in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA]."). Here, the Plan provides that a claimant is entitled to long-term disability if she "is disabled at that time as a result of demonstrable injury or disease (including mental or nervous disorders) which will continuously and totally prevent [her] from engaging in any occupation whatsoever for compensation or profit, including part-time work." Plan § 4.03. To be eligible, however, the claimant must be "under the care of a physician or surgeon for the injury or disease . . . which is the disabling condition, compl[y] with the prescribed

11

treatment plan, and meet[] the other requirements of the Plan." Plan § 4.01.

The Committee, faced with conflicting medical evidence, determined that Gipson was able to engage in some level of employment. Gipson has not shown that this determination was arbitrary and capricious. "Under the arbitrary and capricious standard of review, the plan administrator's decision to deny benefits must be upheld so long as there is a 'reasonable basis' for the decision." Oliver v. Coca Cola Co., 497 F.3d 1181, vacated in part on petition for reh'g, 506 F.3d 1316 (11th Cir. 2007). Here, Selvey and Friedman gave thorough and detailed reasons for their medical opinions. In contrast, Singh's opinion was conclusory, with no rationale. In light of these conflicting opinions, the Committee's decision was not arbitrary and capricious.

C. Weight Given to Consultants

Gipson next argues that the court gave improper weight to the opinion of a one-time examining consultant where her treating physician contradicted this opinion.

We conclude Gipson's argument is without merit. A plan administrator has no obligation to give a treating physician's opinion more weight. See Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003). Here, the treating physician's opinion was conclusory and failed to provide any basis for the decision

12

that Gipson was unable to work. In contrast, the opinions of Selvey and Friedman contradicted Singh's opinion and explained why Gipson was capable of some level of work. Moreover, the other physicians who treated Gipson opined that she required other medication and psychotherapy, all of which Gipson refused. This non-compliance further supports the Committee's conclusion that benefits were not warranted.

D. Prior Disability Award

Gipson also contends that the court should have considered the fact that the Committee had awarded long-term benefits on a prior occasion because the prior payment is relevant. In support of her claim, Gipson relies on <u>Levinson v. Reliance Standard Life Ins. Co.</u>, 245 F.3d 1321 (11th Cir. 2001).

We are not persuaded. First, <u>Levinson</u> does not stand for the proposition that one payment of benefits forever binds the company. In any event, we find the facts of <u>Levinson</u> distinguishable for the simple reason that, unlike <u>Levinson</u>, the medical evidence in this case was not one-sided; there was ample evidence from which the Committee could conclude Gipson was not disabled. Under the terms of the Plan, Gipson was required to show an ongoing disability. We agree with the Committee and the district court that Gipson failed to meet this burden.

V. Conclusion

13

For the foregoing reasons, we conclude that the Committee's decision was not <u>de novo</u> wrong. Thus, we affirm the district court's order granting summary judgment.

**AFFIRMED**.

14