Kimberly HOWARD, an individual,
Plaintiff,

v.

HARTFORD LIFE & ACCIDENT IN-
SURANCE COMPANY a/k/a Hartford
Life d/b/a The Hartford, a corpora-
tion, Defendant.

Case No. 3:10–cv–192–J–34TEM.

United States District Court,
M.D. Florida,
Jacksonville Division.

March 15, 2013.

Alicia Paulino–Grisham, Maggie M. Smith, DI Law Group, Hollywood, FL, for Plaintiff.

Jerel C. Dawson, William J. Gallwey, III, Jonathan M. Fordin, Shutts & Bowen, LLP, Miami, FL, for Defendant.

### ORDER

MARCIA MORALES HOWARD,
District Judge.

This case, brought pursuant to the Employment Retirement Income Security Act of 1974 ("ERISA"), involves a plan administrator's termination of a plan claimant's long term disability benefits. It is before the Court on cross-motions for summary judgment. Specifically pending are Defendant Hartford Life and Accident Company's ("Hartford") Dispositive Motion For Summary Judgment With Statement Of Undisputed Material Facts And Memorandum Of Law in Support Thereof (Doc. 208; Hartford Motion for Summary Judgment), and Plaintiff's [Kimberly Howard] Response In Opposition to Defendant's Dispositive Motion For Summary Judgment (Doc. 222; Howard Response); and Plaintiff's Dispositive Motion For Summary Judgment (Doc. 219; Howard Motion for Summary Judgment), which is opposed by Hartford in Defendant's Memorandum Of Law In Opposition To Plaintiff's Dispositive Motion For Summary Judgment. (Doc. 223; Hartford Response). Additionally pending are Plaintiff's Motion In Limine To Exclude Extra Record Evidence Attacking The Character Of Plaintiff's Witness, Sandra Carter, In Dispositive Motion Briefings (Doc. 211; Howard Motion in Limine), to which Hartford responded in Defendant's Memorandum Of Law In Opposition To Plaintiff's "Motion In Limine" (Doc. 220; Hartford Response to Motion In Limine); as well as Defendant's Motion To Strike Exhibits To Plaintiff's Motion For Summary Judgment, With Memorandum Of Law In Support Thereof (Doc. 221; Hartford Motion in Limine)[1], to which Howard has filed a Response In Opposition To Defendant's Motion To Strike (Doc. 224; Howard Response to Motion in Limine), and Hartford has filed a court-authorized Reply. (Doc. 228; Hartford Reply). The motions are ripe for review.[2]

1. Upon review, the Court determines that Defendant's Motion to Strike Exhibits is properly construed as a Motion in Limine. As Hartford's motion is intended to limit the record evidence to be considered by the Court, the motion is properly viewed as a Motion in Limine. *See Polite v. Dougherty Cnty. Sch. Sys.*, 314 Fed.Appx. 180, 184 n. 7 (11th Cir. 2008) (finding no error in the district court's denial of a motion to strike an affidavit because "motions to strike are only appropriately addressed towards matters contained in the pleadings; here, the affidavit was submitted as part of a motion for summary judgment, which is not a pleading"); *Mobile Shelter Sys. USA, Inc. v. Grate Pallet Solutions, LLC*, 845 F.Supp.2d 1241, 1252–53 (M.D.Fla.2012).

2. The Court takes this opportunity to observe that Howard has had ample opportunity to present her arguments, and indeed, appears to have flagrantly disregarded the Court's page limit requirements. *See* Rule 3.01(a) and (b), Local Rules, United States District Court, Middle District of Florida (Local Rule(s)). Indeed, Howard's use of footnotes was abusive. Howard included 69 footnotes in her Motion for Summary Judgment (Doc. 219) and 38 footnotes in her Response to Hartford's Motion for Summary Judgment, (Doc. 222), all in small font. Many of the footnotes spanned more than half of the page. The footnotes contained numerous string citations of case law, multiple citations to the record, and substantive arguments. In addition to violating the Court's page limit requirements, the footnotes also appear to circumvent Local Rule 1.05, prescribing typeface size, and requiring that, with the exception of block quotations and footnotes, all pleadings shall be "typewritten, double-spaced, in at least twelve-point type." Local Rule 1.05(a).

At the parties' request, the Court granted the parties an additional 10 pages for their dispositive motions, rejecting Plaintiff's request for fifteen (15) additional pages. (Doc. 152; 11/04/11 Order). Thereafter, the Court denied Plaintiff's subsequent request for permission to add an additional five (5) pages to her dispositive motion, or alternatively, to file separately a ten (10) page "statement of undisputed facts." (*See* Doc. 207; 12/04/12 Order). Undeterred by the page limit and typeface requirements set forth in the Local Rules

On March 3, 2010, Plaintiff Kimberly Howard ("Howard" or "Plaintiff") filed this action against Hartford, pursuant to Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), to recover benefits, to enforce rights under her employment benefits plan, and to clarify her rights under the plan. (Doc. 1; Complaint). Hartford originally approved Howard's application for long-term disability ("LTD") benefits commencing November 4, 2005. Subsequently, based upon continuing evaluations of updated medical information, surveillance, and a records review by two physicians and a neuro-psychologist, Hartford determined that Howard was no longer qualified for LTD benefits, and discontinued her benefits, as of November 15, 2006. Howard administratively appealed that decision, and Hartford affirmed its decision. The instant suit challenges Hartford's decision on the administrative appeal.

## I. Facts [3]

### A. The Plan

■ In April of 2005, Plaintiff worked for Fidelity National Financial, Inc. ("Fidelity"), where she held the position of Business Strategy Manager I. Complaint ¶¶ 5, 12, 13; (Doc. 59; Answer ¶¶ 5, 12, 13; [4] Doc. 209; Administrative Record ("AR") at H429). As a Business Strategy Manager I, Howard was responsible for working with product strategy managers to develop strategic visions for Fidelity's mortgage products; assisting in the development of client communications and presentations; assisting with maintaining product requirements and project activities; developing and writing business cases; researching competitive materials and providing quarterly company updates; and working with analysts to ensure product strategies were communicated. AR at H429; see also id. at H220–21. According to a Hartford "Physical Demands Analysis Form" completed by Fidelity, Howard's job as a Business Strategy Manager required sitting for six hours per day, walking or standing for two hours per day, and lifting up to 10 pounds "frequently" and between 10 and 20 pounds "occasionally." AR at H1107; see also id. at H577–78; H220–21. The position could also entail "climbing some stairs on campus," handling papers, stooping or crouching to reach lower drawers, and fingering a keyboard. Id. at H578; see also id. H220–21. The Department of Labor classified Howard's occupation as "sedentary." AR at H426–28, H1332.

During her employment with Fidelity, Howard was a participant in the Fidelity National Financial, Inc. Group Benefit Plan (Doc. 1–1; Plan),[5] which Hartford

and the Court's Orders, Plaintiff packed pages worth of argument into dozens of lengthy footnotes, imposing an unnecessary burden on the Court. Nonetheless, the Court in its discretion, has considered Howard's submissions as filed, notwithstanding their nonconformity with the Local Rules and the Court's Orders. However, counsel is admonished to be more attentive to those requirements in future filings in this Court, or such nonconforming papers may be stricken.

**3.** The following facts are taken from the 2,119–page Administrative Record that was before Hartford at the time it made its final determination to terminate Howard's LTD benefits. (Doc. 209; Administrative Record ("AR")). The Court's review of the Administrative Record is limited to those records specifically cited by the parties. See *Mendenhall v. Blackmun*, 456 Fed.Appx. 849, 852 (11th Cir.2012); see also *BFI Waste System v. DeKalb County*, 303 F.Supp.2d 1335, 1342 n. 5 (N.D.Ga.2004); *Tomasini v. Mt. Sinai Medical Center*, 315 F.Supp.2d 1252, 1260 n. 11 (S.D.Fla.2004).

**4.** "A fact admitted by answer is no longer a fact in issue." *Hill v. Federal Trade Comm'n*, 124 F.2d 104, 106 (5th Cir.1941).

**5.** The Plan is an employee welfare benefit plan subject to and governed by the provisions of ERISA, 29 U.S.C. § 1001, *et seq.*

issued to Fidelity, insured, and underwrote. Complaint ¶ 6; Answer ¶ 6; *see also* Hartford Motion for Summary Judgment at 4. As such, Hartford both funded and administered the Plan. The Plan provides that Hartford has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the [Plan]." Plan at 14. As a Plan participant, Howard would be "entitled to receive disability benefits under the Plan if she meets the definition(s) of disability." Complaint ¶ 9; Answer ¶ 9; *see* AR at H470–73. The Plan contains the following definitions:

> **Disability** or **Disabled** means that during the Elimination Period and for the next 24 months you are prevented by:
> 1. accidental bodily injury;
> 2. sickness;
> 3. Mental Illness;
> 4. Substance Abuse; or
> 5. pregnancy,
>
> from performing one or more of the Essential Duties of Your Occupation, and as a result your Current Monthly Earnings are no more than 80% of your Indexed Pre-disability Earnings.
>
> After that, you must be so prevented from performing one or more of the Essential Duties of Any Occupation.
>
> . . .
>
> **Your Occupation** . . . means your occupation as it is recognized in the general workplace. Your Occupation does not mean the specific job you are performing for a specific employer or at a specific location.
>
> . . .
>
> **Any Occupation** means an occupation for which you are qualified by education, training, or experience, and that has an earnings potential greater than an

amount equal to the lesser of the product of your Indexed Pre-disability Earnings and the Benefit Percentage and the Maximum Monthly Benefit shown in the Schedule of Insurance. . . .

> . . .
>
> **Essential Duty** means a duty that:
> 1. is substantial, not incidental;
> 2. is fundamental or inherent to the occupation; and
> 3. can not be reasonably omitted or changed.
>
> To be at work for the number of hours in your regularly scheduled workweek is also an Essential Duty.

Plan at 15, 17. Thus, pursuant to the provisions of the Plan, for the first 24 months of a claimed disability, eligibility for LTD benefits was conditioned on the claimant's submission of proof that she was prevented by illness or injury from performing, on a full-time basis, "one or more of the Essential Duties of Your Occupation."

### B. *Medical History*

On April 2, 2005, Howard's treating physician, internal medicine specialist Dr. Gary Decker, wrote to Hartford stating that he has been treating Howard for "many years", and in his opinion "she should qualify for total disability" based upon her "multiple debilities." AR at H669.[6] Dr. Decker wrote:

> Her chief problems over that time have been asthma and an autoimmune disorder. The patient has been diagnosed as having a chronic history of multiple joint pains. The problem has progressed over the past years, to the point that I feel that she is unable to maintain any type of employment. The patient has

---

**6.** Though the letter bears the date "April 2, 2001," Howard cites it in conjunction with Dr. Decker's finding on March 30, 2005. Howard Response at 3–4. Additionally, the letter bears a "facsimile" date of April 18, 2005. The Court will assume that it was written April 2, 2005, as contended by Howard.

muscle spasms throughout her body which are debilitating. She is unable to control movements of her hands and legs. She appears fatigued on a chronic basis. It happens even after hours of sleep. She recently has difficulty with sleep. All of these problems have led to a diagnosis of depression also. The patient has trouble concentrating and focusing her thoughts, as well as her short-term memory. She has loss of fine motor control. She has large muscle joint pains with swelling over her joints. She has experienced rashes that have been present intermittently, but are generalized over her torso, arms, extremities, and face. She has frequent headaches, which have not been relieved with any analgesics, and studies that have been done have been unrevealing. *Id.* Howard ceased working at Fidelity on April 28, 2005, due to a diagnosis of lupus and fibromyalgia. *See* AR at H220, H1498.

Dr. Decker reported in a May 3, 2005 Attending Physician's Statement of Disability that Howard was 5′6″ tall and weighed "approximately 323." AR at H663–64; H1274–75. His "Primary diagnosis" was "Lupus, Fibromyalgia, severe joint pain," and his "Secondary diagnosis(es)" was "Depression, short-term memory loss, asthma." Dr. Decker stated that his physical examination of Howard found "decreased ROM [range of motion] all extremities, memory deficit, joint pain." *Id.* [He noted that he began treating Howard for these conditions in April, 2002.] Dr. Decker listed Howard's "Impairment" as follows:

Walking: causes severe joint pain

Sitting: leg pain, numbness

Lifting/carrying: Upper extremity weakness, poor co-ordination

Reaching/working overhead: ↓ ROM of upper extremities, severe joint pain

Pushing: Severe joint pain

Pulling: Severe joint pain

Driving: short term memory loss prevents patient for finding destinations

Keyboard use/repetitive hand motion: Unable to do even simple hand motions such as drying hair, removing bottle tops

*Id.* However, he indicated Howard had no psychiatric impairment and was "Essentially good functioning in all areas." *Id.* Dr. Decker opined that Howard "became unable to work due to this impairment" on April 29, 2005, and that the limitations are "permanent." *Id.* A second "Attending Physician's Statement of Continued Disability" completed by Dr. Decker on May 18, 2005, listed his primary diagnosis as Lupus, and secondary diagnosis as Fibromyalgia. He also noted "Severe Joint Pain, Asthma and Depression." H654–55. The Attending Physician's Statement lists her upcoming doctor or testing appointments, and her "Treatment Plan" as "Medications[7] and Specialists." *Id.* at H655. Dr. Decker stated:

Patient suffers from severe, chronic multiple joint pains and stiffness. Due to hip and knee pain, patient has difficulty standing or walking for more than a few minutes at a time. Sitting for longer than an hour causes severe pain, and stiffness in hips, upper and lower back. Patient suffers from chronic numbness, weakness and swelling in hands, fingers, feet, and legs. Patient experiences dizziness when standing and/or walking, in addition to chronic fatigue and trouble sleeping.

---

7. At that time, Howard's Medications were: "Uniphyl, Singular, Advair, Mobic, Zoloft, Doxephin, Hydrochlorathiazide." AR at H655.

*Id.* According to Dr. Decker, specific limitations precluding Howard from performing the functions of her job were:

- Unable to manage multiple tasks due to short term memory problems and chronic fatigue
- Difficulty standing and sitting for extended periods of time
- Chronic pain in back (upper/lower), numbness, pain and swelling in legs, hands, fingers, feet and major joints
- Loss of fine motor skills
- Difficulty concentrating
- Unable to lift or carry more than 5 pounds

*Id.* at H655. He stated that "Patient is totally and permanently disabled." *Id.* at H654.

Based upon the information submitted, Hartford approved Howard's claim for Short Term Disability ("STD") benefits on May 20, 2005, retroactive to the beginning of the month. Pursuant to the terms of the Plan, the STD benefits would expire six months later on November 3, 2005. *See id.* at H470, H475, H1280; *see also* Complaint ¶ 14; Answer ¶ 14.

On June 17, 2005, a Hartford claim examiner noted that, based upon the medical records received, Howard's "[c]laim has high LTD potential." AR at H1283. Hartford later directed some follow-up questions to Dr. Decker on July 27, 2005, regarding Howard's health and limitations. *Id.* at H572 ("07/27/05 Questionnaire"). In the 07/27/05 Questionnaire, Hartford asked:

2. What are the current clinical findings on examination that support [Howard's] subjective statements that she is unable to work?

Dr. Decker responded:

Muscle spasms which render her unable to control hand and leg movement. Severe joint pain. Short term memory loss. Severe depression resulting in loss of concentration. Frequent headaches. *Id.* Dr. Decker also acknowledged that "per Rheumatology," lab work fails to support a diagnosis of lupus. *Id.* at H572. Nevertheless, he said that Howard's fibromyalgia prohibits her from working in sedentary to light positions because of "Severe joint pain" in her hips and hands, "short term memory loss and loss of concentration," and "lower extremity swelling." He explained that he determined Howard's restrictions through "observation." *Id.*

During this time frame, Howard was also being examined by rheumatologist Dr. Reza M. Taba. AR at H391–395. On August 4, 2005, Dr. Taba reported that Howard presented complaining of aches and pains, difficulty sleeping, and fatigue. He noted that "work up for cardiac status has been negative in the past." *Id.* at H391. After examining Howard's shoulders, elbow, wrists, hands, hip, knees and ankle joints for tenderness and swelling, range of motion, stability, crepitus, warmth, and erythmia, Dr. Taba concluded, "[t]hese joints were found to be without abnormality." *Id.* at H391. While he observed that Howard "appears to be in mild pain," Dr. Taba noted no rash, mouth ulcers, heart problems, abdominal tenderness, swelling in the extremities, or rash, swelling or redness of the skin. *Id.* at H392. Dr. Taba did find tenderness to palpation in Howard's shoulders, middle and lower spine, and elbow, but also observed a full range of motion of the cervical spine. *Id.* Overall, Dr. Taba opined, "Ms. Howard appears to be doing fairly well with the problems as reviewed. There is no obvious sign of inflammatory type arthritis at this time." He instructed Howard to exercise, maintain current medications, and return for a follow up appointment in one month to review blood lab results. *Id.* at H393.

Howard followed up with Dr. Taba on September 19, 2005, complaining of aches and pains, headaches, inability to sleep, and "feeling poorly." AR at H389. After examination, Dr. Taba reported that Howard's shoulder, elbow, wrists, hands, hip, knees, and ankle joints "were found to be without abnormality." *Id.* Dr. Taba reported that Howard appeared to be in "moderate pain" and exhibited "tenderness to palpation" of shoulder and back. He also noted that she was "overweight" at 278 pounds. *Id.* at H290. Howard's blood tests showed an elevated antinuclear antibody (ANA) level, which is relevant to a diagnosis of an autoimmune condition. Dr. Taba concluded:

> Overall Ms. Howard appears to be doing poorly with the problems as reviewed. Although ANA is positive, but there is no other finding in the history or exam to suggest an autoimmune rheumatic disease at this time. There is no obvious sign of inflammatory type arthritis at this time.

*Id.* at H390. Dr. Taba wrote that he had a "long discussion" with Howard about fibromyalgia, and referred her to Brooks Rehabilitation Hospital for "rehab." "She has a great deal of difficulty going back to work, however she was told that with fibromyalgia it would be beneficial for the patient to be active in the society." *Id.* at H390.

Hartford forwarded a second Questionnaire to Dr. Decker on August 31, 2005, asking Dr. Decker to reconcile Dr. Taba's finding that Howard was doing "fairly well" and questioned how the physician's findings of "spasms, severe joint pain" were determined. AR at H534. Dr. Decker responded that he made his determination "after multiple exams," based upon Howard's reports that she was unable to dress herself, and brush her hair "due to severe hand and wrist pain." He left blank and did not respond to Hartford's question about whether Howard's cognitive abilities had ever been tested, stating only

that he determined Howard's cognitive abilities were impaired "with office conversation," and that at times, she was "confused, unable to remember short term events." *Id.* Dr. Decker also reported that he had determined that Howard has "severe problems" based on "Patient reports" of pain. *Id.; see also* H535–H536.

Dr. Decker submitted an Attending Physician's Statement of Continued Disability, dated October 27, 2005, in which he wrote that his primary diagnosis of Howard was lupus and fibromyalgia, with a secondary diagnosis of severe joint pain, asthma, and depression. *See* AR at H481–484; *see also id.* at H221; H478. Dr. Decker opined that Howard had severe limitations in standing, walking, sitting, lifting and carrying, reaching overhead, driving, and using a keyboard ("No more than 1 hr.—causes swelling and severe joint pain"), and that she was unable to push or pull. *Id.* at H482. He also completed a "Physical Capacities Evaluation Form," in which he stated that Howard not was not capable of 1) sitting for more than one hour at a time; 2) standing for more than five minutes; or 3) walking more than "short distances." *Id.* at H483. In support of her application for LTD benefits, Howard also submitted her own typewritten statement in which she reported that she was specifically limited and unable to perform the functions of her job, because of the following impairments:

- Unable to manage multiple tasks due to short term memory problems and chronic fatigue
- Difficulty standing and sitting for extended periods of time
- Chronic pain in back (upper/lower), numbness, pain and swelling in legs, hands, wrists, elbows, fingers, feet, hips and major joints
- Loss of fine motor skills
- Difficulty concentrating

- Unable to lift or carry more than 2–3 pounds
- At times, unable to dress without assistance
- Unable to write or type more than a few minutes due to spasms and pain in fingers and hands
- Unable to cut food, talk on the telephone or read a book or magazine without resting it on a table due to pain, numbness, spasms in hands, arms and fingers and shoulders

AR at H474–H480.

### C. *Hartford Approves LTD Benefits*

On November 1, 2005, Hartford advised Howard that her claim for LTD benefits had been approved effective November 4, 2005, and that she had been approved through November 10, 2005. AR at H470. Hartford required Howard to attend an Independent Medical Examination ("IME") scheduled for her on November 11, 2005, and paid for by Hartford. Hartford notified Howard her LTD benefits would be extended beyond the IME pending its results. *Id.*[8] Pursuant to the terms of the Plan, if eligible for LTD benefits, Howard would receive disability benefits equal to 60% of her monthly income, for a monthly disability benefit of $5,512.03. *Id.* at H470–73. However, Hartford also explained that

> On a periodic basis we will be providing you with supplementary claim forms for the purpose of furnishing us with continued proof of Disability. You will remain eligible to receive benefit payments subject to plan terms and limitations, as long as you meet the plan definition and requirements. . . .

*Id.* at H471.

On November 11, 2005, Dr. Mark Hoffman performed an IME on Howard. AR at

H456–64. Dr. Hoffman noted that Howard was a 43 year old woman, height 5′6″, and though she would not get on the scale, he estimated her weight to be approximately 300 pounds. *Id.* at H461. Dr. Hoffman reviewed Howard's medical records, and previous test results. He noted that Howard had a "normal ANA rheumatoid factor" in 2003, and March 2005 blood tests, and that her most recent ANA test in August 2005 "was positive." He recounted three x-rays, which were all "negative"; a magnetic resonance image ("MRI") of the right hip which showed "no abnormalities"; a pulmonary function test in 2003 which showed a " 'Moderate decrease in gas exchange' "; a "normal" electrocardiogram in January 2005; a "negative" carotid doppler report dated January 2005; and a May 2005 pelvic ultrasound which only showed evidence of a previous hysterectomy. *Id.* at H460. Dr. Hoffman observed that while Howard entered the examination room with a cane, she was able to get on and off the examination table independently. *Id.* at H461. Dr. Hoffman conducted a physical examination of Howard, and noted tenderness on palpation of her neck, spine, back, upper sternum, one elbow, shoulders, hands, and right hip. He said that "[s]he had full range of motion of the joints, except in the left shoulder [describing limitations] . . ., and right hip range of motion was mildly limited in all directions due to pain." Dr. Hoffman recorded that Howard had clear lungs and a normal heart beat. He did not observe a muscle spasm "due to adipose tissue," but did observe "mild diffuse swelling of the lower extremities and hands." He observed that Howard was alert, cooperative, had normal speech, and became tearful during the evaluation. *Id.*

---

**8.** Howard had suggested that Hartford perform a Functional Capacities Evaluation ("FCE"), and that she had located a provider who would perform one. AR at H1309. Hartford set up an IME instead. *Id.* at H1310.

H461–62. Dr. Hoffman listed his "Impression" as:

1. Probable fibromyalgia.
2. Possible systemic lupus erythamatosus.
3. History of depression.
4. History of asthma.
5. Obesity.

*Id.* at H462. Dr. Hoffman noted that his objective findings "were limited to edema in the hands and distal lower extremities, as well as a malar rash over her face." *Id.* at H462. Hoffman wrote:

Although Ms. Howard has some symptoms and objective abnormalities (major rash and positive ANA) consistent with SLE [lupus], from the medical records reviewed, and from her examination today, it is uncertain whether she truly has this diagnosis. On the other hand, fibromyalgia is likely based upon her symptomatology. Fibromyalgia is not a condition that can be confirmed with any objective tests or findings. She does have diffuse tenderness on palpation over traditional fibromyalgia tenderpoints but also has diffuse pain over other areas. She does not have inconsistences evident on physical examination and appeared to be a reliable historian.

*Id.* at H463. Dr. Hoffman recommended the following "work and activity restrictions:"

No lifting or carrying greater than 10 pounds occasionally, less than one hour per day of keyboarding and repetitive hand motion, avoidance of pulling, pushing, and repetitive bending, repetitive overhead activities, or standing/walking more than 10 minutes at a time.

*Id.* at H462. Based on the results of the IME, Hartford extended Howard's LTD benefits beyond November 2005. *Id.* at H455, H1323–24.

Howard continued to see Dr. Decker for follow-up visits. On February 6, 2006, he reported that Howard "continues to have severe pain in her joints and muscles," "experienced frequent palpitations," and reported pain in her left shoulder "due to pain which radiates from her cervical spine and shoulder down the left arm" creating a "sensation of parathesia and heat in the extremity." AR at H401. A March 1, 2006 MRI of Howard's left shoulder suggested "probable impingement with degeneration or partial-thickness tear of ... [two] tendons." H362. An MRI of Howard's spine, also on March 1, 2006, revealed mild, slight or small bulging discs at four locations. H372–H375.

On August 7, 2006, Dr. Decker saw Howard for a follow-up visit. He reported that Howard "is having a great deal of difficulty with her joints particularly her upper extremities and cervical spine.... She is still requiring pain control." AR at H1262. Three months later, on November 13, 2006, Dr. Decker noted that Howard "continues to have pain in her left shoulder" and "pedal edema," swelling in the feet and ankles. *Id.* at H1260. On November 30, 2006, Dr. Decker reported that Howard "continues to have a number of symptoms related to her fibromyalgia. She also has difficulty with sleep, tachycardia [fast heart rate], chest pains, and bladder." *Id.* at H1258.

The Administrative Record reflects that Howard also had a series of six appointments between March 27, 2006 and September 20, 2006 with three orthopaedic doctors, presenting to them with neck, back and shoulder pain. AR at H335, H337, H340, H351, H352, H1235, H1236. Following a series of evaluations and tests, the orthopaedic diagnosis was:

1. Chronic pain syndrome.
2. Scheuermann's Disease.
3. Fibromyalgia.
4. Lupus.

5. Left shoulder partial rotator cuff tear.
6. Trace left sided carpal tunnel syndrome. Mild right sided carpal tunnel syndrome.
7. Neck pain, disc bulges at C4–5 and C5–6 that does intent the thecal sac. Possible radiculopathy.

AR at H1235. The orthopaedic doctors recommended medication, physical therapy, and participation in a pain management program.

Howard also consulted with cardiologists between 2003 and 2005. AR at H634–43. The cardiologists found no cardiac abnormalities, and concluded that her "significant overweight disorder ... may be the absolute etiology for her shortness of breath." *Id.* at H635–36. A treadmill study was "terminated because of fatigue" and not due to chest discomfort, *Id.* at H641. The cardiologist noted "cardiovascular deconditioning." *Id.* A second cardiologist opined that the " 'pleuritic pain' " of which Howard complains is not cardiac-related. *Id.* at H634.

### D. *Hartford's Investigation*

Hartford initiated surveillance of Howard in March 2006 "[t]o better understand [her] capabilities." AR at H221; *see also id.* at H148–H202; H1328.[9] Investigator Jose Martinez ("Martinez"), with Triad Investigations, began an investigation on March 9, 2006. *Id.* at H148; H169. Hartford's investigative Case Information Form regarding Howard reflected that Howard's benefits, commencing November 4, 2005, were $4,220 a month, and that $432,819.00 was listed in "net reserve." *Id.* at H149.

A total of 60–hours of surveillance was conducted over the course of six days: March 30–31, April 1, and May 8, 9, and 10, 2006. AR at H151–H153, H168–H202 (Triad Investigative Report). The investigator furnished Hartford with three-hours and fourteen (14) minutes of surveillance video, and a written report of Howard's observed activities during more than 20 hours away from her home. The following description of the observed activities, some of which were documented in the surveillance video, are taken from Hartford's Case Information Form, *id.* at H151–53; Triad Investigations Investigative Report, *id.* at H168–H202; the November 10, 2006 Independent Medical Report of Dr. William Sniger, M.D., who reviewed and analyzed the surveillance report and video at Hartford's request, *id.* at H237–39; and Hartford's November 15, 2006 correspondence to Howard terminating her LTD benefits. *Id.* at H218–28. The surveillance results are also found in Hartford's Investigative Summary, dated January 1, 2007. *Id.* at H1811–1906.

March 30, 2006: Howard was observed taking her daughter to and from school and stopping briefly at the local library. "You were observed sitting for approximately 50 minutes while waiting for your daughter," and "driving approximately 22 miles." Howard was observed walking "with a normal gait without any assistive devices," and pulling her purse strap over her head. She was away from her home one hour and six minutes.

AR at H151; H173–75; H221; H237.

March 31, 2006: Howard was away from her home approximately five hours and 57 minutes. During this time, Howard was observed driving her daughter to and from school, going to a book store, a Wal–Mart store, a pizza shop, a nail salon, a Hallmark store, and a grocery store. Howard was observed pumping gas without difficulty handling the noz-

9. A March 9, 2006 entry in Hartford's notes regarding Howard's claim states that "claim proactively reviewed by SIU and accepted for investigation." AR at H1328.

zle and screwing the gas cap; walking normally while carrying her cane in her right hand; bending at her waist and reaching above her head; carrying two shopping bags in her left hand while talking on a cell phone held also in her left hand; sitting in her car talking on her cell phone for 10 minutes; shopping—in Wal Mart continuously for an hour; pushing a full shopping cart to her vehicle; pushing open a store door; "turning her head fully to the left while turning the steering wheel fully with her left hand and simultaneously talking on a cell phone that she held in her right hand"; and sitting in her car for 45 minutes while waiting for her daughter to exit school.

*Id.* at H221, H151, H221, H238.

April 1, 2006: Howard was observed away from her home approximately one hour, driving for 15 minutes.

*Id.* at H151; H181–82; H221; H238. At this point, the Hartford investigative examiner wrote in the Case Information Form, in a "summary" dated April 18, 2006:

Investigative Disposition: During this investigation the claimant was observed walking with and without her cane. The claimant was active for almost 6 hours on 3/31. However, we did not document significant activity on consecutive days and the claimant was observed using a cane at times. We have not documented significant inconsistencies which would impact this claim. Therefore, at this time I am closing out my handling of this claim. The claimant's physician has recommended exercise and weight loss. If the claimant improves her physical condition surveillance may be appropriate in the future. TJS.
04/19/06—Investigation closed auto email sent. (HITS)
4/21/06—I discussed this file with Team Leader Schacht. We have not docu-

mented inconsistencies which would impact this claim at this time. However, the subject's observed activities of being away from her residence for approximately 6 hours while driving her daughter to and from school, going to a book store, a Wal Mart, a Pizza Shop, a nail salon, a Hallmark store, and a grocery store are inconsistent with the claimant's reported restrictions of being unable to stand or walk greater than 5–10 minutes or needing assistance washing her hair. During the surveillance time she was also observed bending at the waist and reaching above her head. The inconsistencies documented do need further investigation. To further document the claimant's activities I will request that Triad conduct an additional 20 hours of surveillance. TJS.

*Id.* at H151–52; *see also id.* at H192 (on April 21, 2006, Triad "instructed to conduct an additional investigation"). On April 21, 2006, the Summary Report reflects that "SIU has reopened its investigation." AR at H1329.

Thereafter, on May 8, 2006, the Hartford examiner wrote that Hartford had received an update from Triad Investigations regarding a second round of surveillance. AR at H152. The following surveillance observations were made:

May 8, 2006: Howard was observed driving her daughter to and from school, "operating a vehicle. Howard sat in her vehicle for 33 minutes waiting for her daughter to emerge from school. Howard was observed opening a box of crackers using both hands, reading, turning pages, and manipulating papers, while sitting in her vehicle. She was away from her home approximately one hour and 51 minutes, sitting in her vehicle a total of one hour and 11 minutes.

AR at H152; H193; H196–97; H221.

May 9, 2006: Howard was observed dropping her daughter off at school and

driving 124 miles south to Titusville, Florida and back again, traveling on Interstate 95, a two-hour drive each way. "The subject was documented operating a vehicle for extended distances, approximately 248 miles in total, requiring her to sit for long periods, and walking." At the end of the trip, she drove to the middle school. Howard was away from her residence approximately seven hours.

*Id.* at H152; H193; H197; H221–22.[10]

May 10, 2006: Howard observed arriving at car dealership and walking to service center to pick up her vehicle, then driving to the bank, and then her residence. During this errand, Howard was observed walking first 20 yards, and then 35 yards at the dealership and 20 yards at the bank, carrying her purse in her left hand. She remained at the bank for one hour, and then returned to her vehicle where she "opens the driver's door and bends down at her waist into the floor board area of the driver seat" and then "stands upright and raises her right leg as she enters the vehicle via the drivers door." Howard then traveled to a restaurant, and then to Brooks Hospital, accompanied by two females. There, Howard was observed exiting her vehicle and retrieving a metal walker from the rear of the vehicle for the older female traveling with her. Howard was "documented riding as a passenger in a vehicle, operating a vehicle, entering/exiting a vehicle, walking, leaning/bending at her waist, and lifting

a metal walker," walking 40 yards to the hospital entrance. She was observed walking without a cane, and appear to walk with a normal gait while carrying her purse in her left hand. When driving, "[s]he turned the steering wheel with a normal hand-overhand motion as she backed out. . . ." Howard was away from her home for three hours and 57 minutes.

*Id.* at H153, H193, H200–H201, H222, H238–29.

At the conclusion of the two rounds of surveillance, the Hartford examiner wrote:

6 days of surveillance have been completed. The subject has been observed on each day of surveillance running errands. She was away from the residence for extended periods of time up to 7 hours and driving a total of 248 miles in one day. The subjects [sic] observed activities are not consistent with the claimant's reports of being limited due to pain and fatigue. Therefore at this time I will refer this file to SIU Home Office for a claimant interview.

I also requested updated medical records from the claimant's physicians and I requested that the examiner refer this file for an Occupational Analysis as this was not done prior to approval.

*Id.* at H153. In sum, Howard was observed away from her home in various activities for a total of 20 hours and 51 minutes over the course of six days of surveillance, divided into two three-consecutive-day segments. Approximately three hours and fourteen (14) minutes of the observed activity was recorded by the investigator on a surveillance video. (Doc. 210; Notice).[11]

---

10. Hartford authorized another day of surveillance after being informed of Howard's observed distance-driving. AR at H152.

11. Hartford filed eleven (11) Compact Disks (CD's) containing surveillance video, stating that the video was a part of the Administrative

Record. (Doc. 201; Notice). The Court has viewed the CD's, and notes that some of the CD's repeat each other. A total of three hours and fourteen minutes of nonrepeating surveillance video is in the Administrative Record.

On June 30, 2006, Howard was interviewed at her residence for three hours by Triad investigator Martinez. *Id.* at H1707–15; *see also* H154–55; H222–26; H1822–1833. Martinez provided Howard with a detailed statement ("06/30/06 Disability Statement") regarding her condition, restrictions and limitations. Howard reviewed the statement, and made handwritten corrections she wished to make, and then signed and dated the statement, certifying that it was "true and accurate."

H1707–15.[12] Martinez did not advise Howard about the surveillance and video, stating that "[d]ue to the claimant's mood swings and emotional state I decided that to show the video had the potential to aggravate the claimant's mental condition." *Id.* at H155. Martinez observed Howard pick up her small dog (4 to 5 pounds) with her left arm, walk slowly with a cane, sit for three hours, use a pen, hold and turn pages of paper to review, and shake hands. *Id.* at H156. She displayed a "good range

**12.** In the *06/30/06 Continuing Disability* Statement, Howard certified that

> The disabling medical conditions that currently prevent me from returning to work are that I do not sleep more than 3 to 4 hours a night due to severe pain and numbness in shoulders, hands, and arms, lower back and hip, I have experienced severe pain in cervical, thoracic and lower back. I suffer from depression due to cognitive issues and pain. I also suffer from limited and sustained mobility in arms due to numbness, pain, and swelling of joints.

06/30/06 Disability Statement, AR H1707. Howard listed her ailments as spondylosis (chronic pain in joints, muscles, and fatigue), fibromyalgia (chronic muscular pain, extreme fatigue, and sleeping problems, irritable bowel syndrome, and cluster headaches), Scheurmann's Disease (severe chronic pain in thoracic area), and lupus (including chronic fatigue and pain all over body, leg swelling, chest pains, short term memory loss). *Id.* at H1707. Howard stated that her conditions are being treated with medication and home exercise, and that she uses a cane "90% of the time." *Id.* at H1709. She listed her physical restrictions as follows: walking for 5–10 minutes ("When I have walked for more than ten minutes I then have to sit and rest because of the pain in my entire body"); standing five to ten minutes (same restriction as walking); lifting and carrying less than 3 pounds ("a box of tissues"); bending ("I am able to bend at the waist sometimes"); use of hands ("I do not have full use of my hands and fingers" ... I cannot open a bottle of water or cut cooked meat ... [my] dexterity is enough to button a button, zip a zipper or use keys to unlock a door. I cannot write more than a sentence or two without severe pain in my fingers and wrists"; "I am un-

able to type more than five minutes"; "I must use a speaker phone or head phones when talking on the phone. My arms and fingers go numb within two to three minutes" when talking on a telephone); sitting ("I am not able to sit for more than one hour, because it causes me severe pain and stiffness in hips, upper and lower back"); concentration ("I am not able to concentrate because I have experienced problems with my memory ... An example of my inability to concentrate is that I recently got lost when driving to places that I normally am. I forget where I am and why I am there. I can't even order in a restaurant without being confused or losing my words. As a result I am extremely frustrated and depressed. I have to lie down after a few hours of being awake"); driving ("I can drive approximately about 30 minutes or less ... I only go as far as 15 to 20 miles ... If I drive more than 20 miles, I experience pain level of 8 to 9 in my hips, upper back, and lower back"); hygiene ("I do need help with dress and personal hygiene"). *Id.* at H1709–12. Howard stated she had lost 15 pounds since "becoming disabled." *Id.* at H1712. She said that her "pain level on a best day is 5 and on a bad day it is a 10." *Id.* at H1712. Howard stated that her condition had deteriorated in the past six months, and that at no time during the past six months did she experience a time "when I could exceed the level of functionality or be more active than I have described above." *Id.* at H1713.

On June 19, 2006, Howard submitted to Hartford a detailed completed "Personal Profile evaluation—Ongoing" form reporting the same conditions and limitations she had reported in October 2006, and then again on June 30, 2006. AR at H259–67.

of motion." *Id.* He reported that she was emotional "a few times" and appeared depressed, "she cried often, cooperative, attentive, complained of pain, she repeatedly kept asking me 'how much longer' and she remained responsive throughout the entire interview." *Id.*

Hartford sent the surveillance video, the surveillance summary, and the 06/30/06 Disability Statement, as well as Howard's medical records from 2001 through 2006, to Dr. William Sniger, a board certified physician in physical medicine and rehabilitation, and spinal cord injury medicine, with the Medical Advisory Group LLC, ("MAG"). AR at H229–H240. In his report, dated November 10, 2006, Sniger observed that "[s]urveillance video revealed the claimant performing activities in excess of her stated limitations." *Id.* at H239.

> During the 6 days of surveillance, the claimant occasionally used a cane, but her gait appeared non-antalgic with normal stride, cadence, speed and balance although somewhat waddling due to her obesity. She appeared to have normal [range of motion] of all 4 extremities, neck and back and showed no signs of fatigue or discomfort. She apparently had no difficulty ordering at two restaurants and had no problems getting lost while driving hundreds of miles.

*Id.* He continued:

> She briefly used a cane, but most of the time did not and ambulated with an essentially normal gait although she somewhat waddled due to her morbid obesity. [She] showed no signs of fatigue or discomfort while bending 90 degrees at the waist, walking up and down the aisles at a bookstore and while shopping at Wal–Mart, talking on a cell phone while walking and driving, and continuously driving for 2 hours at a time × 2 during one day.

*Id.* Dr. Sniger concluded that: "Based upon the subjective and objective information available to me, it is my opinion with a reasonable degree of medical certainty that the preponderance of information does not support the claimant's alleged inability to perform full-time work from a physical perspective." *Id.* at H240. Sniger recommended that Howard be provided with the following restrictions: "Lifting/carrying of 10 pounds occasionally; opportunity to change positions periodically; standing/walking occasionally; no climbing, squatting or crawling. No other restrictions are indicated." *Id.*[13]

### E. *Termination of LTD Benefits*

In a letter to Howard, dated November 15, 2006, Hartford terminated Howard's LTD benefits. AR H218–28. Hartford wrote that

> We have completed our review of your claim for benefits and have determined that the evidence submitted in support of your claim does not establish that you continue to meet the Policy [Plan] defini-

---

**13.** On October 2, 2006, Hartford sent the surveillance video, the video summary, and the 06/30/06 Disability Statement to Howard's internal medicine physician Dr. Decker, and several other physicians who had seen Howard, including her orthopedist, requesting a response with regard to Howard's restrictions and functionality. AR at H215, H254–55, H1337. Dr. Decker did not respond to Hartford's request for comments. *Id.* at H213, H227. Sniger noted that "[a]lll of [Howard's] physicians deferred to one another in offering an opinion regarding her functional capacity." *Id.* at H239. Additionally, Dr. Sniger wrote a letter to Dr. Decker asking for confirmation of their conversation with each other in which Dr. Sniger states that Dr. Decker advised he had not performed any objective testing on Howard; that "she can work sometimes and sometimes cannot"; that Dr. Decker had not viewed the surveillance video; and that Dr. Decker was "unable to provide an opinion regarding her functional capacity." H241.

tion of Disability. Accordingly, LTD benefits are not payable to you under the terms of this Policy beyond November 15, 2006. . . .

*Id.* at H218. Hartford wrote that it based its decision to terminate the LTD benefits upon the Plan's language and "all documents contained in your claim file, viewed as a whole." *Id.* at H219. In the letter, Hartford compared the observations made of Howard during the surveillance and recorded in the video with her inconsistent responses made in the 06/30/06 Disability Report, including 1) her statement that she used her cane 90% of the time when she was observed during surveillance using the cane "infrequently;" 2) her statement that she could not sit for more than one hour, when she "remained seated in her padded dining room chair for 3 hours and ten minutes" during the interview; and 3) her statement that she could not drive for more than 30 minutes or more than 20 miles, when in fact she was observed driving for approximately 248 miles. *Id.* at H226. Hartford wrote that "[a]fter reviewing the statements you provided to Mr. Martinez, we felt that additional clarification of your medical condition was necessary as it did not appear that your observed activities and self-report activities were consistent with your report that you were unable to perform your sedentary occupation," and referred the claim to Hartford's Medical Claim Manager. *Id.* Hartford determined that "[b]ased on the documents in your claim file, . . . you have the ability to perform a sedentary to light

occupation with the following restrictions and limitations: lifting/carrying of up to 10 lbs. occasionally; opportunity to change position periodically; standing/walking occasionally; no climbing, squatting or crawling." *Id.* at H228. Comparing this finding with the job description for Business Strategy Manager I, "[t]he weight of the evidence does not support that you are prevented from performing the Essential Duties of Your Occupation." *Id.*

Hartford's investigative Case Information Form reported that the investigation was initiated March 9, 2006, and that the end status was "closed." It reported an "Outcome" of "Termination" on November 15, 2006, and "Amount $316,022.00." AR at H148, 150. Hartford's January 7, 2007 Investigative Summary, entitled "Questionable Disability Claim" "Howard, Kimberly A," *id.* at H1811, reported "Date Concluded" as November 15, 2006, and "Reserve: $316,022.00." *Id.* at 1812.

### F. Howard's Appeal of Termination of LTD Benefits

On May 11, 2007, Howard, through her attorney, appealed Hartford's termination of her LTD benefits, in accordance with the Plan's procedural framework. AR at H1440–52. In the appeal, Howard contended that she is "totally disabled and unable to perform one or more of the essential duties of her occupation due to her fibromyalgia and lupus." *Id.* at H1444.[14] Hartford Examiner James Pow-

---

14. The appeal letter listed her "serious and increasingly debilitating physical disabilities" as being:

Fibromyalgia, Systemic Lupus Erythematosis, bilateral Carpal Tunnel Syndrome, cervical degenerative disc disease, including severe joint pain, and left shoulder rotator cuff tear, chronic and debilitating fatigue, and MRI findings of: C3–4 disc bulge in-

denting the anterior thecal sac with cord deformity; C4–5 disc bulge indenting the anterior thecal sac; C5–6 loss of disc height and hydration with disc bulge, spondylosis and hypertrophy of facets and ligamentum flava indenting the thecal sac, short-term memory loss and severe depression secondary to pain, resulting in loss of concentration, and frequent headaches.
AR at H1440–41.

ell was assigned to Howard's appeal. *Id.* at H1348.

In support of her appeal, Howard cited to the January 25, 2007 report of Dr. Orlando Florete, with the Institute of Pain Management in Jacksonville, Florida. AR H1249–52; H1453. Dr. Florete stated that Howard reported to him she experienced severe burning or throbbing pain at numerous points that has "worsened over time and is tender to touch." "Exercise, prolonged sitting, standing, walking, change in the weather, stress, sex, fatigue, bending forward or backward, leaning forward, coughing, sneezing, touching the skin, and working worsen the pain." *Id.* at H1250. Under the heading "Functional Capacity," Dr. Florete wrote:

> The patient is totally and permanently disabled. She used to work for Fidelity Company but had to stop working because of the progressively increasing pain, fatigue, and memory loss.

*Id.* at H1251. In his physical examination, Dr. Florete noted tenderness on palpation in the back, neck, shoulders, chest, and multiple joints including shoulder, elbows, wrists, fingers, knees, ankles and feet. However, he also noted no heart problems, no tenderness in the abdomen, no range of motion problems in the spine, good pulses in extremities, no edema, and no focal neurological deficit. *Id.* at H1251. Based upon his examination and review of her medical records, Dr. Florete diagnosed:

1. Fibromyalgia.
2. Cervical degenerative disc disease.
3. Systemic lupus erythematosus.
4. Carpal tunnel syndrome bilaterally.
5. Left shoulder rotator cuff tear.

He recommended physical therapy and medication. *Id.* at H1252.

Howard also submitted an Attending Physician Statement, completed by Dr. Florete on February 13, 2007, reiterating the observations he made the previous month, and listing her limitations and restrictions as being unable to lift more than 10 pounds, and being "prohibited" from "prolonged standing, walking, sitting, kneeling." Dr. Florete opined that Howard is "totally disabled" and that her prognosis is "poor in terms of future employment." AR at H1244–146; H1453. In addition to medications, Dr. Florete recommended cervical epidural injections, to which she responded she would think about it, and physical therapy for her reported neck pain with intermittent numbness of both extremities. *Id.* On April 5, 2007, Dr. Florete examined Howard and said the physical exam "remains unchanged." *Id.* at H1253; H1453. Howard reported to Dr. Florete that the pain in her neck and upper back is worse, grading it as a 7 out of 10. The doctor increased medication and continued to recommend steroid injections and physical therapy. *Id.* at H1253. Howard had pursued neither physical therapy or steroid injections, despite Dr. Florete's previous recommendations. *Id.*

Howard further supported her appeal with an Attending Physician Statement by Dr. Decker, dated April 22, 2007. Dr. Decker reported that "Patient states that she experiences severe joint pain in all extremities and cervical spine," and "severe loss of use of both hands," rendering her unable to dress. Dr. Decker listed restrictions "according to" Howard as needing assistance with all activities" and "mobility is extremely limited." Dr. Decker listed his diagnosis as being fibromyalgia, hypertension, chronic fatigue, insomnia, depression (which is secondary to disability), and listed "lupus as diagnosed by rheumatologist Taba." Dr. Decker concluded that "when patient has a flare up of her fibromyalgia and lupus she is totally disabled. This is frequent." AR at H1254–56.

The Administrative Record also includes a Vocational Evaluation Report submitted by Howard, dated June 27, 2006. AR at H1502–14. Vocational rehabilitation consultant Teresa Manning ("Manning") reported that she conducted an evaluation on June 8, 2007, followed by an interview on June 25, 2007, necessitated by Howard's "inability to continue the initial evaluation due to physical discomfort...." *Id.* at H1503. Manning noted that the Business Strategy Manager position is classified as "sedentary and skilled." *Id.* at H1507. Manning reviewed Howard's medical records and the results from Hartford's surveillance of Howard, and recounted Howard's "perception" of her medical status. Manning did not report that her evaluation included any functional capacity testing. Based on her review, Manning concluded that Howard is totally disabled and unable to work an any job for the following reason:

> The physical and cognitive results of trying to cope with continuous pain does not equate to the day to day reliability and attentiveness expected by any employer in the competitive job market. When adding the claimant's daily fatigue necessitating rest periods exceeding 2 hours per day her ability to achieve a full time structured work schedule is further compromised. Likewise, the expected loss of concentration and focus caused by Mrs. Howard's fatigue and pain is an added detriment to her productivity and subsequent employability.

The end result is the claimant becomes unable to work on a full time basis with reasonable continuity in any occupation irregardless of that occupation's physical demands category or skill classification. *Id.* at H1513. Addressing the surveillance observations and videos, Manning said that equating "minutes or even hours of filmed attempts on isolated days of assisting her elderly parents ... or driving her only child to school and after school activities with the ability to carry out essential functions of any occupation with reasonable continuity for a 40 hour work week is ludicrous." *Id.* at H1513–14. Additionally, she rejected Dr. Sniger's opinion that Howard could perform the duties of her job, albeit with some restrictions. Manning opined that Howard's inability to engage in sedentary work renders her unable to perform the essential duties of her occupation or of "any gainful occupation" for which she is qualified. *Id.* at H1514.[15]

Howard also submitted her own rebuttal of Hartford's surveillance findings. AR at H1593. Howard explained that on April 25, 2006, she drove 125 miles to Titusville, two hours south of Jacksonville, to assist her elderly mother care for her father, who had fallen in the driveway and broken his hip. She said she stayed in Titusville for a week, and then she had her parents transported to Jacksonville's Brooks Rehabilitation Hospital. *Id.* at H1593–94. Two weeks later, on May 9, 2006, Howard drove her mother to Titusville to retrieve

---

15. The Administrative Record includes additional cardiology records from this time period. A December 19, 2006 cardiology exercise treadmill test was prompted by Howard's complaints of chest pain and numbness in her abdomen and arms. Although the study was terminated due to fatigue, it "was felt to be a negative exercise treadmill test." AR at H1237. One month later, Howard visited another cardiologist for a "second opinion regarding whether or not cardiac disease is a contributing factor to her symptoms" because she did not feel "reassured" by the negative stress test results the month before. *Id.* at H1239. The second cardiologist found no murmurs, no bruits, no chest tenderness, and clear lungs, and wrote: "To date, objective testing has been negative for isochomia. Patent's electrocardiograph is slightly abnormal. Low voltage in the procordial leads could be a sign of periocardial effusion related to lupus. It is more likely related to obesity." *Id.* at H1240.

her father's leg brace, clothes and paperwork. They drove back to Jacksonville that same day. *Id.* at H1594. This *second* drive to and from Titusville was the one observed by Hartford's investigator. Howard did not specifically recall the other events observed, but stated that the March 31, 2006 day in which she was observed away from her home for six hours making numerous stops "must have been a good day for me." *Id.* at H1593. Howard reiterated that:

> [a]ll of the information that I documented and told Mr. Martinez [in the 06/3006 Disability Statement] is 100% true and I will swear to it under oath. However, not all of these symptoms persist to the highest level 100% of the time.

*Id.* at 1595.

In his Initial Appeal Review, dated May 31, 2007, Hartford appeals specialist James Powell wrote that based upon the record, "an additional medical review will be needed." AR at H1348–49. Accordingly, neuropsychologist Dr. Carol Walker, Ph.D., and physician Dr. Phillip Marion, both of whom are with the company Reed Review Services ("RSS"), reviewed Howard's medical records and claim file at Hartford's request.[16] The consulting health care providers reviewed Howard's extensive medical records, Hartford's investigation and video surveillance, and Dr. Sniger's report. The packet of information provided to the consulting providers included Hartford's Case Information Form, which contained the above-noted "net reserve" dollar figure. *See id.* at 1516. The reviewers forwarded their findings to Hartford in a report dated June 26, 2007. AR at H1515–24. Dr. Walker determined that "There is no objective evidence of deficit in functionality from a neuropsychological perspective. There are no restrictions or limitations from 04/2005 through the present," and "insufficient data" to connect How-

ard's physical issues with psychological issues. *Id.* at H1517. According to Dr. Walker:

> Based on the records reviewed, there is no objective data to support psychological or cognitive symptoms that would interfere with her ability to work. She has not been evaluated or treated by a mental health professional. Cognitive and psychological issues have not been documented as the focus of treatment by her medical providers other than for an increase in Zoloft and a recommendation that she see someone for depression. Ms. Howard reportedly declined this recommendation.

*Id.* at H1518. Walker opined that "[f]rom a psychological/neuropsychological perspective, there are no restrictions or limitations." *Id.* at H1517–18.

Dr. Marion also reviewed Howard's extensive medical records and the surveillance results. Dr. Marion stated:

> The patient is a 44 year old obese female with complaints of chronic musculoskeletal pain and underlying diagnosis of lupus. Her treating rheumatologist indicated there was no physical examination evidence of inflammatory joint disease. Neurological examination is consistently normal. Her continued complaints of incapacitating full body pain are inconsistent with her observed functional independence.

AR at H1522. Dr. Marion stated his opinion that Howard has the "ability to work at least at the light duty occupational level," with an unrestricted sitting requirement. *Id.* at H1523. Dr. Marion recognized the following physical restrictions: standing and walking (up to four hours a day); climbing (two flights of stairs occasionally); lifting and carrying (20 pounds occasionally and 10 pounds frequently); and occa-

---

**16.** RSS also appears to go by the name "Reliance RS." *See* AR at H1515.

sional pushing, pulling, bending, squatting, twisting and upper extremity use (with left shoulder). *Id.* He concluded that "there is insufficient evidence to preclude Ms. Howard from performing her full-time sedentary occupation." *Id.* In conclusion, Dr. Walker, in consultation with Dr. Marion, wrote that Howard's reported chronic pain, and obesity "would not preclude her ability to work," and that "[t]he medical records do not support functional incapacity for this claimant." *Id.* at H1524. The Walker/Marion report is "unsigned." Howard Response at 19 (citing H1524).

Hartford upheld its termination of Howard's LTD benefits under the Plan, on June 28, 2007. Complaint ¶ 24; Answer ¶ 24; AR at H1498–H1500. Referencing Howard's medical history and the surveillance video, Hartford's Senior Appeal Specialist James Powell wrote in a letter to Howard's attorney:

> [T]his is a complicated claim in large part due to the nature of Ms. Howard's conditions. More specifically, in determining her functionality her physicians must rely almost exclusively on her report as opposed to specific testing. As such, it is not surprising that the forms reflect rather significant limitations and restrictions as Ms. Howard perceives herself as very limited. However, Ms. Howard's report is indeed at odds with the surveillance inasmuch as Ms. Howard is more functional than the restrictions noted on the forms and as reported by her.

*Id.* at H1499. Noting that Howard had been diagnosed with fibromyalgia and lupus years before she ceased working, Hartford stated that it is "unclear what precipitated the cessation from work...." *Id.*

> There is no indication of a clear event or incident or even one specific malady that suddenly caused her to stop working. Instead, it appears that the combination

of her symptoms, by her own perception, made working 40 hours per week difficult for her. It would stand to reason then, that while not working, she also could not repeatedly perform activities day after day yet again this is contradicted by the surveillance in that she was observed as fairly active on consecutive days.

*Id.* Powell wrote that Hartford had reviewed the report from Howard's vocational consultant Manning, as well as "all other evidence," and concluded "there remains insufficient support for Ms. Howard's claim." *Id.* at H1500.

> While Ms. Howard was not observed on surveillance for 5 straight days, 8 hours per day, she was observed performing activities in excess of her reported limitations and as such, her report is not entirely reliable. Thus, the restrictions and limitations imposed by her physicians, being rooted in Ms. Howard's report almost exclusively, is likewise an unreliable indicator of Ms. Howard's functionality.

*Id.* Hartford determined that "the weight of the evidence continues to support Ms. Howard's capacity to perform her occupation on a full-time basis," citing to the opinions of three consulting health care providers—Drs. Sniger, and Marion, and Walker, and Hartford's nurse practitioner—as support, and discounting the opinions of Howard's physicians, Drs. Decker and Florete, because they did not review Ms. Howard's activity in the surveillance videos. *Id.* at H1500; H1352. Hartford concluded that "[w]hile we do not dispute that Ms. Howard indeed has the condition of Fibromyalgia, it is clear that she has been capable of working for years with said condition, and as noted by Dr. Sniger and Dr. Marion, and further corroborated by surveillance, Ms. Howard remains capable of performing activities consistent with

sedentary to light duty work commensurate with the demands of her occupation." *Id.* at H1500.

Hartford has not paid Howard LTD benefits since November 15, 2006. Complaint ¶ 25; Answer ¶ 25.

## II. *Applicable Summary Judgment Standard*

■ Under Rule 56(a), Federal Rules of Civil Procedure (Rule(s)), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). However, " '[i]n an ERISA benefit denial case ... in a very real sense, the district court sits more as an appellate tribunal than as a trial court. It does not take evidence, but rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary.' " *Curran v. Kemper Nat'l Servs., Inc.*, No. 04–14097, 2005 WL 894840, at *7 (11th Cir. Mar. 16, 2005)[17](quoting *Leahy v. Raytheon Co.*, 315 F.3d 11, 17–18 (1st Cir. 2002)); *see also Harvey v. Standard Ins. Co.*, 850 F.Supp.2d 1269, 1275 n. 5 (N.D.Ala.2012), aff'd *Harvey v. Standard Ins. Co.*, 503 Fed.Appx. 845 (11th Cir. 2013); *Epolito v. The Prudential Ins. Co. of Am.*, 737 F.Supp.2d 1364, 1369 (M.D.Fla.2010). Accordingly, where an administrator's decision is reviewed for abuse of discretion, " 'a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exist, do not apply.' " *Crume v. Metro. Life Ins. Co.*, 417 F.Supp.2d 1258, 1272 (M.D.Fla.2006) (quoting *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir.1999), *abrogated on other grounds by Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 965 (9th Cir.2006) (en banc)); *Disanto v. Wells Fargo & Co.*, No. 8:05–CV–1031–T–27MSS, 2007 WL 2460732, at *4 (M.D.Fla. Aug. 24, 2007); *Menard v. Hartford Life & Accident Ins. Co.*, No. 6:05–cv–1145–Orl–31DAB, 2006 WL 3091527, at *4 (M.D.Fla. Oct. 30, 2006); *Providence v. Hartford Life and Accident Ins. Co.*, 357 F.Supp.2d 1341, 1342 n. 1 (M.D.Fla.2005). Indeed, where the ultimate issue to be determined is whether there is a reasonable basis for a claims administrator's benefits decision, it is difficult to ascertain how the "normal" summary judgment rules can sensibly apply. After all, the pertinent question is not whether the claimant is truly disabled, but whether there is a reasonable basis in the record to support the administrator's decision on [the point in contention]. *Crume*, 417 F.Supp.2d at 1273. Thus, "conflicting evidence on the question of disability cannot alone create an issue of fact precluding summary judgment, since an administrator's decision that rejects certain evidence and credits conflicting proof may nevertheless be reasonable." *Crume*, 417 F.Supp.2d at 1272. The Court will review this case using the modified Rule 56 standard set forth in *Curran* and *Crume*. *See Curran*, 2005 WL 894840, at *7, *Crume*, 417 F.Supp.2d at 1272–73; *see also Ganceres v. Cingular Wireless Health and Welfare Benefits Plan for Non–Bargained Emps.*, No. 3:04–cv–199–J–32HTS, 2006 WL 2644919, at *6–7 (M.D.Fla. Sept. 14, 2006).

## III. *Standard of Review Applicable to ERISA Benefit Determinations*

■ Under 29 U.S.C. § 1132(a)(1)(B), a person may bring a civil action "to recov-

---

**17.** Although an unpublished opinion is not binding ..., it is persuasive authority." *United States v. Futrell*, 209 F.3d 1286, 1289 (11th Cir.2000) (per curiam).

er benefits due to him under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B). ERISA itself provides no standard for review of the benefits decision of plan administrators. *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 108–109, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Based on Supreme Court guidance in *Firestone* and *Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 115–119, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008), the Eleventh Circuit has established a multi-step framework for review of ERISA benefit decisions:

(1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).[18]

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship v. Metro. Life Ins. Co.,* 644 F.3d 1350, 1355 (11th Cir.2011). All steps of the analysis are "potentially at issue" when a plan vests discretion to the plan administrator to make benefits determinations. *Id.,* at 1356 n. 7. Thus, even if the Court were to determine that the administrator's decision was "*de novo* wrong," the Court must proceed to the next steps of the Eleventh Circuit's analysis and accord the appropriate level of deference due to Hartford's determination as the Plan administrator.[19] Further, in instances where LTD benefits are once approved, and subsequently terminated, a claimant retains the burden of proving continued disability after benefits are discontinued and the administrator need not show a change in the claimant's condition. *Richards v. Hartford Life and Accident Ins. Co.,* 356 F.Supp.2d 1278, 1284 (S.D.Fla.2004), *aff'd,* 153 Fed.Appx. 694 (11th Cir.2005); *Hufford v. Harris Corp.,* 322 F.Supp.2d 1345, 1360 (M.D.Fla.2004).

Here, there is no dispute that Hartford had full discretion and authority to determine eligibility benefits and to construe and interpret all terms and provi-

---

**18.** "In ERISA cases, the phrases 'arbitrary and capricious' and 'abuse of discretion' are used interchangeably." *Blankenship v. Metro. Life Ins. Co.,* 644 F.3d 1350, 1355 n. 5 (11th Cir.2011).

**19.** [S]ome courts have begun their analysis by assuming the plan administrator's decision was wrong and proceeded directly to the question of whether the administrator's decision was arbitrary and capricious." *Moeller v. Guardian Life Ins. Co. of Am.,* No. 5:10–cv–457–Oc–34TBS, 2011 WL 7981954, at *7

(M.D.Fla. Dec. 16, 2011), *adopted* 2012 WL 1986591 (M.D.Fla. June 4, 2012), *appeal dismissed,* No. 12–13573 (11th Cir. Dec. 14, 2012). Under this approach, the Court may "analyze the facts and the parties' arguments once in arriving at its conclusions" as to whether Hartford's decision was right or wrong, and if wrong, whether it was arbitrary and capricious. *Id.* Accordingly, the Court will bypass the *de novo* right or wrong determination, and proceed directly to an arbitrary and capricious analysis.

sions of the Plan. Plan at 14. Thus, under *Blankenship*, the Court's review of Hartford's decision to terminate Howard's LTD benefits is governed by the deferential "arbitrary and capricious" standard of review. "Under the arbitrary and capricious standard of review, the court seeks 'to determine whether there was a reasonable basis for the [administrator's] decision, based upon the facts as known to the administrator at the time the decision was made.'" *Townsend v. Delta Family–Care Disability and Survivorship Plan*, 295 Fed.Appx. 971, 976 (11th Cir.2008) (quoting *Hunt v. Hawthorne Assocs., Inc.*, 119 F.3d 888, 912 (11th Cir.1997) (internal quotations and brackets omitted)). "As long as the decision had a reasonable basis, it 'must be upheld as not being arbitrary and capricious, even if there is evidence that would support a contrary conclusion.'" *Moeller v. Guardian Life Ins. Co. of Am.*, No. 5:10–cv–457–Oc–34TBS, 2011 WL 7981954, at *6 (M.D. Fla. Dec. 16, 2011) (quoting *White v. Coca–Cola Co.*, 542 F.3d 848, 856 (11th Cir.2008)), *adopted* 2012 WL 1986591 (M.D.Fla. June 4, 2012). "[A] plan administrator is entitled to weigh the evidence and resolve conflicting evidence about the claimant's disability." *Townsend*, 295 Fed. Appx. at 977 (citing *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1452 (11th Cir. 1997)). Even if the "evidence is close," an administrator does not abuse its discretion in resolving conflicting evidence. *Doyle v. Liberty Life Assur. Co. of Boston*, 542 F.3d 1352, 1363 (11th Cir.2008).

### IV. *Motion in Limine*

 Hartford has moved to exclude Exhibits 1 through 30 filed by Howard in support of Howard's Motion for Summary Judgment. Hartford Motion in Limine; (*see* Doc. 215 (Exhibits 1–30)). Citing *Blankenship, supra*, Hartford argues that because none of these exhibits were available or considered by the Plan administrator at the time of the decision to terminate Howard's LTD benefits or to deny Howard's administrative appeal, they do not fall within *Blankenship's* direction that judicial review is "limited to consideration of the material available to the administrator at the time it made its decision." Hartford Motion in Limine at 3 (quoting *Blankenship*, 644 F.3d at 1354); *see also* Hartford Reply.

Howard opposes Hartford's Motion in Limine. She points to the Supreme Court's language in *Glenn, supra*, which suggests that a structural conflict of interest may weigh more heavily as a factor "where an insurance company administrator has a history of biased claims administration," or more lightly "where the administrator has taken active steps to reduce potential bias and to promote accuracy." *Glenn*, 554 U.S. at 117–18, 128 S.Ct. 2343 (internal citations omitted). According to Howard, this language anticipates that outside evidence may be considered on the conflict of interest issue. Howard's Response to Motion in Limine at 2, 5. Howard cites to a number of cases from courts outside of the Eleventh Circuit, primarily in the Ninth Circuit, holding that extrinsic evidence may be considered on the question of whether a plan administrator's conflict of interest affected its decision to deny benefits. *Id.* at 2, 9, 10, 12. Additionally, Howard contends that the administrative record " 'does not by necessity, contain all of the facts known to the administrator.'" *Id.* at 3, 4 (quoting *Fish v. Unum Life Ins. Co. of Amer.*, 229 F.R.D. 699, 701 (M.D.Fla.2005)); *see also id.* at 6.

The Eleventh Circuit has consistently stated that in an ERISA case, a court's review of an ERISA administrator's discretionary benefits decision under the arbitrary and capricious standard is confined to the evidence that was before the plan administrator when the claim for benefits was denied. *See Blankenship*, 644 F.3d at

1354; *Gipson v. Administrative Comm. of Delta Air Lines, Inc.*, 350 Fed.Appx. 389, 394 (11th Cir.2009) (no additional medical evidence); *Townsend*, 295 Fed.Appx. at 976; *Doyle*, 542 F.3d at 1360; *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246–47 (11th Cir.2008) (court is limited to the record that was before the plan administrator when it made its decision), *cert. denied*, 555 U.S. 1048, 129 S.Ct. 646, 172 L.Ed.2d 614 (2008); *Richards v. Hartford Life & Accident Ins. Co.*, 153 Fed. Appx. 694, 696 n. 1 (11th Cir.2005). Most recently, the Eleventh Circuit reiterated that "when an ERISA plan does grant the plan administrator discretion, the reviewing court, under the arbitrary and capricious standard, may only consider 'the facts known to the administrator' at the time of the decision." *Herman v. Hartford Life and Accident Ins. Co.*, 508 Fed. Appx. 923, 927 (11th Cir.2013) (quoting *Lee v. Blue Cross/Blue Shield of Ala.*, 10 F.3d 1547, 1550 (11th Cir.1994)); *see also Harvey*, 503 Fed.Appx. at 849 ("only the record before [the administrator] during its consideration of [claimant's] initial claim or administrative review thereon is relevant").[20]

As Plaintiff notes, discovery regarding an administrator's conflict of interest in ERISA cases has been permitted in appropriate circumstances, in this Circuit, (*see* Doc. 108; 06/27/11 Omnibus Discovery Order; Doc. 183; 07/26/12 Order, and cases cited therein); *see also e.g.*, Howard Response to Motion to Strike at 4 n.4 (citing cases). However, the decisions allowing such discovery, which Plaintiff cites, do not address the question of the ultimate use of the extra-record evidence. *See Richards*, 356 F.Supp.2d at 1288. The Eleventh Circuit, to date, has not expanded judicial review of a benefits decision beyond the information which was before the ERISA plan administrator at the time of the decision. *See Bloom v. Hartford Life and Accident Ins. Co.*, No. 11–CV–81393, 917 F.Supp.2d 1269, 1277, 2013 WL 238838, at *5 (S.D.Fla. Jan. 23, 2013) ("The Eleventh Circuit has not yet weighed in on the matter" of the court's consideration of extra-record materials). Nevertheless, the Eleventh Circuit has advised that for a court to overturn an ERISA administrator's decision based upon a conflict of interest, the structural conflict of interest must be of sufficient " 'inherent or case-

---

**20.** Howard's citation to dicta found in a footnote in *Doyle* in which the Eleventh Circuit recognized the unique procedural posture presented by a summary judgment arbitrary and capricious analysis presented by ERISA cases, *see Doyle*, 542 F.3d at 1363 n. 5, does not render reliance upon the *Blankenship* admonition "warped." Howard's Response to Motion to Strike at 8. The Court in *Doyle* observed that the ERISA decision in that case was "bottomed on the administrative record," and that

 [i]t seems preferable in a case like this for the district court to determine by conference or stipulation whether either party desires to present evidence beyond the administrative record, and if not, take the case under submission and enter findings of fact and conclusions of law. Rule 56 practice seems to be an extra and unnecessary

step—and one that can result in two appeals.

*Id.* at 1363 n. 5. *Doyle* was decided before *Blankenship* concluded that under Supreme Court precedent, conflict of interest was but a "factor" to be considered in an arbitrary and capricious review. Moreover, the Court's statement recognizes that traditional Rule 56 summary judgment principles do not apply in ERISA benefits decision cases under an arbitrary and capricious judicial review. Additionally, the court in *Doyle* upheld an administrative decision denying LTD benefits to a claimant claiming disability from fibromyalgia. In doing so, the court stated that "[t]here is no evidence in the record suggesting 'a higher likelihood that [the conflict] affected [the administrators] benefits decision,' such as 'a history of biased claims administration.' " *Doyle*, 542 F.3d at 1363 (quoting *Glenn*, 554 U.S. at 117, 128 S.Ct. 2343).

specific importance.'" *Blankenship,* 644 F.3d at 1357 (quoting *Glenn,* 554 U.S. at 117, 128 S.Ct. 2343).

The Court has located one trial court decision within this Circuit in which the court approved consideration of extrinsic evidence when undertaking an arbitrary and capacious review of an ERISA benefits decision. The court in *Bloom, supra,* permitted consideration of extrinsic evidence, noting that courts in other circuits have carved out "exceptions" allowing consideration of extra-record evidence, based on the Supreme Court's language in *Glenn. See Bloom,* 917 F.Supp.2d at 1277–78, 2013 WL 238838, at *6 (citing cases). Based on this, the *Bloom* court held that "extra-record evidence is admissible where Bloom can demonstrate the evidence will be used to support a claim of procedural misconduct or bias on the part of Hartford." 917 F.Supp.2d at 1278, 2013

WL 238838, at *6. Thus, the court permitted consideration of "extra-record materials pertaining to Bloom's accusations that Hartford deviated from its own claims practices, and thus failed to provide a full and fair review." *Id.* However, the court declined consideration of extra-record evidence on the issue of whether or not the claimant was disabled, offered to "substantively impact her eligibility for benefits." *Id.*

Here, Howard has submitted thirty exhibits, some of which she did not cite at all in her briefing, others she cited only by exhibit number despite the exhibit being hundreds of pages in length, and many of which are far-afield of Hartford's decision regarding Howard's specific LTD benefits eligibility.[21] Only some of the exhibits were in existence at the time of the administrator's decision, and most importantly, none establish that an inherent or case-

---

21. These exhibits are: Declaration of Howard's counsel (Doc. 215–1; Ex. 1); Deposition of James Powell (Doc. 215–2; Ex. 2); Deposition of Carol Walker (Doc. 215–3; Ex. 3); Hartford Best Practices Memo dated June 29, 2006 (Doc. 215–4; Ex. 4); Affidavit of former Georgia claims analyst Sandra Carter, dated October 31, 2011 (Doc. 215–5; Ex. 5); Hartford Responses to Howard Interrogatories, dated April 19, 2011 (Doc. 215–6; Ex. 6); Hartford Supplemental Answers to Howard Interrogatories, dated July 13, 2011 (Doc. 215–7; Ex. 7); Deposition of Bruce Luddy, Hartford Director of Litigation and Appeals (Doc. 215–8; Ex. 8); Hartford Employee Compensation Overview for 2005–2007 (Doc. 215–9; Ex. 9); Deposition of Bruce Luddy taken in a Connecticut case, dated May 28, 2010 (Doc. 215–10; Ex. 10); Sandra Carter Training Notes and "QAR" Reports (Docs. 215–11, 215–12, 215–13, 215–14, 215–15, 215–16, 215–17; Ex. 11); Printout of pages from "The Physician Network" Website, dated April 19, 2011 (Doc. 215–18; Ex. 12); Hartford Answers to Interrogatories in a New York case, dated March 31, 2009 (Doc. 215–19; Ex. 13); Answers of William Sniger, M.D. to Howard's Written Deposition (Doc. 215–20; Ex. 14); Medical Advisory Group LLC 1099 Summary (Doc. 215–21; Ex. 15); Deposition of Anthony McGovern (Doc. 215–22; Ex. 16); Medical Advisory Group's Answers to Howard's Written Depositions Questions (Doc. 215–23; Ex. 17); Howard's Written Deposition Questions of Reliable Review Services a/k/a Reed Review Services ("RSS") (Doc. 215–24; Ex. 18); June 10, 2011 Correspondence to Dr. Walker (Doc. 215–25; Ex. 19); July 14, 2011 Correspondence to Dr. Marion (Doc. 215–26; Ex. 20); Hartford Clinical Orientation Program Manual (Docs. 215–27, 215–28, 215–29; Ex. 21); Printout of pages from Triad Investigations Website, dated April 7, 2011 (Doc. 215–30; Ex. 22); Deposition of Philip Marion, M.D. (Doc. 215–31; Ex. 23); Hartford "Appeals Procedures" (Doc. 215–32; Ex. 24); Clinical Quality Assurance Worksheet copied from the docket in another case (Doc. 215–33; Ex. 25); Excerpt from The Medical Disability Advisor Reference Text (Doc. 215–34; Ex. 26); Hartford Case Information Form re: Howard (Doc. 215–35; Ex. 27); Daily Journal Newswire Article dated October 13, 2009 (Doc. 215–36; Ex. 28); Reed Review Services ("RSS") Vendor Contract (Doc. 215–37; Ex. 29); Medical Advisory Group ("MAG") Vendor Contract (Doc. 215–38; Ex. 30).

specific bias affected the administrator's decision in this case, or a higher likelihood that the structural conflict of interest affected the administrator's benefits decision. In this case, where Hartford is vested with discretion in reviewing claims, the Court proceeds under the arbitrary and capricious standard to determine whether reasonable grounds support Hartford's benefits decision. In this context, Hartford's structural conflict of interest is one "factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious." *Blankenship*, 644 F.3d at 1355. Consideration of Hartford's conflict of interest is not *de novo* under the *Blankenship* framework. On the record of this case, Plaintiff's allegations of bias or procedural abnormality are insufficient to warrant consideration of the additional evidence offered by Howard in its arbitrary and capricious review. Moreover, even having reviewed the extra-record exhibits submitted and cited by Howard, the Court determines they are either irrelevant to Howard's claim, or are not of sufficient inherent or case-specific importance to warrant reversal of the Hartford's benefits decision here as arbitrary and capricious. Accordingly the Hartford Motion in Limine is due to be granted.[22]

## V. *Discussion*

Howard contends in her Motion for Summary Judgment that Hartford's decision to terminate her LTD benefits was wrong, and arbitrary and capricious, and should be reversed for a number of reasons. Howard argues that Hartford's decision is "wrong" because in accordance with the definition of "disability" set forth in the Plan, she is considered "disabled" if she is unable to perform "one or more" of the essential duties of her occupation. Howard contends that the evidence is undisputed that she is unable to type, which constitutes one of the essential duties of her job. Howard Motion for Summary Judgment at 9–11; Howard Response at 1–2, 11–12. Additionally, Howard argues that although Hartford's reviewing health care providers opined that Howard was capable of performing a "sedentary" job, there is no evidence she is capable of working "full time," an essential duty of her occupation. Howard Motion for Summary Judgment at 11. Further, Howard argues that Hartford was wrong to rely upon the surveillance and the "flawed" records review by three independent health care providers. *Id.* at 13, and that its financial conflict of interest permeated the administrative review process. *Id.* at 15–35.

Hartford, not surprisingly, views the record differently. It argues that Howard has not met her burden of establishing that she is disabled, and of proving that Hartford's decision to terminate her benefits was arbitrary and capricious. Hartford Motion for Summary Judgment at 18–19. Hartford contends that Dr. Decker's and Dr. Hoffman's typing restriction was based upon Howard's subjective complaints, which were discredited by the observations made during surveillance. Hartford Response at 2–6. Hartford notes that its reviewing physicians, Dr. Sniger and Dr. Marion, did not include typing in their lists of physical limitations or restrictions, and that Hartford was not wrong or unreasonable to rely on those opinions. Hartford Response at 7–8. Additionally, Hartford argues that Howard has not shown that the value of Howard's claim, or Hartford's investigation of her claim through surveillance and review by con-

---

22. It follows then that Plaintiff's Motion In Limine To Exclude Extra Record Evidence Attacking The Character Of Plaintiff's Witness, Sandra Carter, In Dispositive Motion Briefings (Doc. 211) is due to be denied as moot.

**1292**

sulting physicians, establishes that Hartford's benefits decision was a product of bias or conflict of interest. *Id.* at 14–20.

## A. *Disability*

█ While the Court recognizes that Howard suffers from an array of ongoing medical problems and chronic pain, the question presented by her claim of unlawful termination of disability benefits is whether her medical conditions are sufficiently work-preclusive to establish disability under the ERISA Plan. *See Richey v. Hartford Life & Accident Ins. Co.*, 608 F.Supp.2d 1306, 1310 (M.D.Fla.2009) ("ERISA disability is not established merely by the existence of pain, even chronic pain, in the absence of proof that the claimant's pain actually precludes him or her from working"); *Sanzone v. Hartford Life and Accident Ins. Co.*, No. 06–61135–CIV, 2008 WL 80984, at *11 (S.D.Fla. Jan. 3, 2008) ("whether Plaintiff is 'disabled' under the policy is not based on whether she has been diagnosed with a certain medical condition"). To prove her entitlement to LTD benefits under the Plan, Howard is required to demonstrate that she was disabled from her "Own Occupation" throughout the elimination period, and beyond, as those terms are defined in the Plan.

Howard argues that she "consistently had positive clinical findings consistent with fibromyalgia and systemic lupus" and thus she "provided sufficient objective evidence of her conditions and it is unreasonable for [Hartford] to require Ms. Howard to provide objective evidence [of] her pain and fatigue." Howard Motion for Summary Judgment at 16–17; *see also* Howard Response at 2–3. Hartford responds that "Howard cannot meet her burden of establishing a disability merely by pointing to

her diagnoses or to her alleged symptoms of pain, fatigue, etc." Hartford Motion for Summary Judgment at 20. Instead, Hartford contends, "Howard's burden of demonstrating her inability to work in her occupation requires her to prove that she was incapable of performing sedentary work." *Id.* at 21.

It is undisputed that Howard's treating physicians diagnosed her as having lupus, fibromyalgia,[23] "severe joint pain," depression, short-term memory loss, and asthma; that she reported that she suffers from joint pain, headaches, and sleep disturbances; and that she has been treated since at least 2002 for these conditions. AR at H663–64 (Dr. Decker May 3, 2005 Attending Physician Statement). There is also substantial evidence in the Administrative Record establishing discrepancies between Howard's actual functional abilities and the functional abilities that she reported to her treating physicians and to Hartford.

Howard argues that Hartford incorrectly interpreted the Plan's definition of "Disability," contending that she need only establish that she is unable to perform one essential duty of her job, i.e. typing. Howard Motion for Summary Judgment at 9–11. The Eleventh Circuit considered precisely this question in *Richards*, 153 Fed. Appx. at 695–97, a case in which the claimant reported ailments similar to Howard's, and in which the applicable ERISA plan, which was administered and funded by Hartford, contained the identical definition for "disability." The District Court in *Richards*, which was affirmed by the Eleventh Circuit, construed "general workplace" limitation in the Plan's "your occupation" requirement as follows:

**23.** "Fibromyalgia 'is a rheumatic disease and the relevant specialist is a rheumatologist.'" *Pinto v. Aetna Life Ins. Co.*, No. 6:09–cv–01893–Orl–22GJK, 2011 WL 536443, at *3 n. 7 (M.D.Fla. Feb. 15, 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996)).

Plaintiff's argument overlooks Policy language defining "Your Occupation" as "your occupation as it is recognized in the general workplace" and "does not mean the specific job you are performing for a specific employer." ... Although Plaintiff may have been unable to perform some particular on-the-job assignment, the medical opinions presented to Hartford were in accord that Plaintiff's health conditions would not keep her from performing sedentary tasks, including close reading and detail work. "A person may not be able to perform a specific job assignment, but still be able to perform the duties generally, understood to be part of his or her 'occupation.'" *Ehrensaft v. Dimension Works Inc. LTD Plan*, 120 F.Supp.2d 1253, 1259 (D.Nev.2000).... The plain language of the Policy directed Hartford to evaluate Plaintiff's ability to perform her occupation as it is generally recognized in the workforce. The Court cannot say that Hartford erred in applying the "general workplace" standard in evaluating Plaintiff's capacity to perform her occupation.

*Richards*, 356 F.Supp.2d at 1286–87. Accordingly, Hartford's interpretation of the Plan's definition of "disability" was not arbitrary and capricious. *See* AR at H220–21 (11/15/06 Termination Letter).

Moreover, the Department of Labor classified Howard's occupation as "sedentary." AR at H426–28, H1332. "Sedentary work involves 'sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.'" *Townsend*, 295 Fed. Appx. at 976 (quoting Department of Labor, Dictionary of Occupational Titles); *see also Richards*, 153 Fed.Appx. at 697 ("The Department of Labor's Dictionary of Occupational Titles defines sedentary work as requiring exertion of 'up to 10

pounds of force occasionally . . . and/or a negligible amount of force frequently . . . to lift, carry, push, pull, or otherwise move objects'"). Nothing in the definition of "sedentary" requires eight hours a day of continuous typing. Moreover, "courts have repeatedly upheld administrative claim denials where medical evidence indicates that shifting position as needed would enable the claimant to perform sedentary work." *Richards*, 356 F.Supp.2d at 1287 (citing *inter alia Turner v. Delta Family–Care Disability and Survivorship Plan*, 291 F.3d 1270, 1273–74 (11th Cir. 2002)). Nothing in the record suggests that Howard had any difficulty performing the substantial duties of her job before she stopped working in April 2005. Finally, inherent in the opinions from Drs. Sniger and Marion that Howard is not disabled and is capable of performing a sedentary job, is a determination that she is capable of working full-time. The reviewing professionals placed no time limit on Howard's capability to work, other than taking an occasional break to stand. As such, their opinions were reasonably construed by Hartford as including full-time employment, and it was not an abuse of discretion for Hartford to rely on their opinions in upholding its termination of Howard's LTD benefits. *See Richards*, 153 Fed. Appx. at 697.

### B. *Objective Evidence*

■■■ Howard argues that Hartford improperly terminated her LTD benefits by unreasonably requiring her to produce objective evidence of her pain and fatigue. Howard Motion for Summary Judgment at 16–17 (citing *Oliver v. Coca Cola Co.*, 497 F.3d 1181, 1196 (11th Cir.2007), *vacated, in part, on other grounds*, 506 F.3d 1316 (2007)). Additionally, Howard contends that the opinions of her treating physicians, who had the advantage of actually physically examining her and assessing her face to face, constitute objective evidence

of her physical limitations, and inability to perform any essential function of her occupation. Howard Motion for Summary Judgment at 14. In response, Hartford counters that the treating physicians' opinions were based upon Howard's subjective complaints, which they accepted at "face value," and which have been discredited by her own observed activity. Hartford Motion for Summary Judgment at 29–32.

With respect to the opinions of Howard's treating physicians, the Court notes that "[n]o special weight is to be accorded the opinion of a treating physician." *Ray v. Sun Life & Health Ins. Co.,* 443 Fed.Appx. 529, 533 (11th Cir.2011) (citing *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 829–33, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003)), *cert. denied,* —— U.S. ——, 133 S.Ct. 547, 184 L.Ed.2d 343 (2012); *see also Blankenship,* 644 F.3d at 1356 ("Plan administrators need not accord extra respect to the opinions of a claimant's treating physicians"); *Townsend,* 295 Fed.Appx. at 978 ("plan administrators are not required to give greater weight to the submissions of a treating physician than to other reliable evidence"). Moreover, while a claim administrator may not refuse to consider reliable evidence, the administrator is not required to accord deference to the opinions of treating physicians, or to credit treating physicians' opinions that are based upon the claimant's subjective complaints. *Bloom,* 917 F.Supp.2d at 1281, 2013 WL 238838, at *9; *Moeller,* 2011 WL 7981954, at *9 (citing *Nord,* 538 U.S. at 834, 123 S.Ct. 1965); *Giertz–Richardson v. Hartford Life and Accident Ins.*

*Co.,* 536 F.Supp.2d 1280, 1292–93 (M.D.Fla.2008). Indeed, doctors' diagnoses do not in and of themselves, establish a disability and inability to work. *Bloom,* 917 F.Supp.2d at 1281, 2013 WL 238838, at *9; *Williams v. Hartford Life and Accident Ins. Co.,* No. 8:02–CV–85–T17MAP, 2010 WL 557265, at *8 (M.D.Fla. Feb. 12, 2010). Rather, the subjective nature of the treating physicians' observations, reports, and diagnoses may be taken into account. *Bloom,* 917 F.Supp.2d at 1281, 2013 WL 238838, at *9; *Giertz–Richardson,* 536 F.Supp.2d at 1292–93.

Although Howard's treating physicians repeatedly documented Howard's subjective complaints of pain, diagnosed her based upon those complaints, and prescribed a panoply of medications to treat them, none of the records confirm her disability status or assess her functional limitations in relation to her ability to perform her occupational duties with Fidelity, as defined by the Plan. Moreover, Howard's vocational consultant Teresa Manning relied on Howard's own description of her limitations and the medical reports of Howard's treating physicians, without any vocational or functional capacity testing. *See Harvey,* 503 Fed.Appx. at 849–50; *Harvey,* 850 F.Supp.2d at 1286.

While a "consistent diagnosis" of chronic pain by a claimant's treating physician, "along with the consistent observations of physical manifestations of [claimant's] condition" may constitute objective medical evidence, *Lee v. BellSouth Telecomms., Inc.,* 318 Fed.Appx. 829, 837 (11th Cir.2009),[24] a claimant's "subjective

---

24. In *Lee,* the court determined that the ERISA plan administrator's denial of STD and LTD benefits based upon a conclusion that the claimant had not provided "objective medical evidence" of chronic pain syndrome, 318 Fed.Appx. at 837 (citing *Oliver,* 497 F.3d at 1197), was arbitrary and capricious. The circumstances in *Lee* are distinguishable from the facts of this case. In *Lee,* the reviewing medical professionals upon which the administrator relied in denying benefits never addressed the claimant's treating physicians' observations that the claimant was incapable of working a full time job, and did not have the benefit of a surveillance video to actually view the claimant's physical capabilities. *Id.* at 839

complaints do not become objective simply because a doctor wrote them down." *Cusumano v. Continental Cas. Co.*, 2008 WL 1711405, at *7 (M.D.Fla. Apr. 10, 2008). " 'Even for subjective conditions like fibromyalgia, it is reasonable to expect medical evidence of an inability to work.' " *Pinto v. Aetna Life Ins. Co.*, No. 6:09–cv–01893–Orl–22GJK, 2011 WL 536443, at *10 (M.D.Fla. Feb. 15, 2011) (quoting *Creel v. Wachovia Corp.*, No. 08–10961, 2009 WL 179584, at *9 (11th Cir. Jan. 27, 2009)). Thus, "[w]hile an administrator cannot automatically disregard subjective complaints, administrators are also not required to automatically give significant weight to all subjective complaints." *Giertz–Richardson*, 536 F.Supp.2d at 1292.

Additionally, while Howard gave a myriad of subjective complaints, her treating physicians reported that numerous medical tests yielded negative results. Indeed, the only "objective" measures of any ailment reported by her treating physicians were an elevated ANA blood test, occasionally visible edema in her ankles and hands, and slightly bulging and degenerated discs. Yet, based upon these findings, the treating physicians diagnosed lupus, fibromyalgia, and depression.[25] However, a plethora of objective medical tests revealed no objective infirmities. Additionally, Howard's examining cardiologists consistently reported that all objective tests were negative; her blood pressure was generally in the normal range; and her inability to complete a treadmill test was more likely due to cardiovascular de-conditioning and obesity. While Howard provided objective test results indicative of degenerative disc disease, such findings do not establish that she was totally disabled and unable to perform her sedentary job. Indeed, back

pain related to the spine was not her chief complaint; rather it was fibromyalgia and lupus, and concomitant diffuse pain, fatigue, and inability to use her hands. *See generally Harvey*, 850 F.Supp.2d at 1286–87 (claimant's degenerative disc disease diagnosis and treatment did not confirm her disability status or her functional limitations).

Hartford was entitled to consider objective evidence, including the report of Howard's rheumatologist, as well as electrocardiogram ("EKG") results, lab tests, and chest x-rays showing no objective heart, lung or blood infirmities. Moreover, Hartford was permitted to consider the veracity of Howard's subjective reports of pain to her physicians, in light of more than 20 hours of surveillance observations, and three hours and fourteen minutes of surveillance video showing her driving, carrying bags, a purse, and a walker, talking on the phone, walking, shopping, and generally conducting the normal daily affairs of living. The record does not support a finding that Hartford failed to properly consider Howard's treating physicians' opinions or that it denied Howard LTD benefits based simply on a failure by Howard to offer objective medical evidence. *See Gipson*, 350 Fed.Appx. at 393; *Keith v. Prudential Ins. Co. of Am.*, 347 Fed. Appx. 548, 551 (11th Cir.2009); *Taylor v. Broadspire Servicing, Inc.*, 314 Fed.Appx. 187, 192 (11th Cir.2008); *Stiltz v. Metro. Life Ins. Co.*, 244 Fed.Appx. 260, 264 (11th Cir.2007).

Similarly, with respect to Howard's subjective complaints of cognitive impairment and loss of concentration, Dr. Walker noted the absence of any objective findings. There is no dispute that none of the records provided to Hartford for its review

---

**25.** Indeed, Howard's treating physicians acknowledged that their diagnosis of lupus was not supported by any objective test results. *See* AR at H391–93, H585, H591, H593,

H1254; *see also id.* at H463 (IME physician Dr. Hoffman notes that no objective physical test supported the diagnosis of lupus).

indicates that Howard sought treatment for any cognitive impairments. AR at H1252 (Howard rejected pain management physician Dr. Florete's recommendation that she seek psychological counseling). Indeed, her treating physicians consistently reported that Howard was engaged, alert, communicative, and had no "focal neurological deficit." *See e.g.* AR at H1252. Although Howard reported to both Hartford and her doctors that she was unable to concentrate, she drove her daughter to and from school on a daily basis, and was able to drive two hours each way on the interstate to her parents' home.[26] Howard attended multiple doctor appointments; discussed her health during a three hour interview; and typed lengthy letters and reports herself.[27] Thus, Howard has failed to establish that Hartford abused its discretion in not recognizing her reported cognitive impairments as a basis for continuing her LTD benefits.

### C. *Reviewing Physicians and Health Care Professionals*

■ In addition, Howard argues that Hartford's "excessive reliance" upon the "flawed" opinions of its three reviewing health care professionals was wrong, and arbitrary and capacious. Howard Motion for Summary Judgment at 13. Specifically, Howard contends that the RSS consultants (Dr. Marion and Dr. Walker) reviewed "incomplete information" which did not include the Plan's definition of "disability," Howard's explanation of her activities observed in the surveillance and accompanying video, or all of the medical records submitted by Howard in support of her appeals. Additionally, she asserts that Dr. Walker, a neuropsychologist, was "not properly qualified;" and that the report contains "blatant inconsistences" apparently referring to the recounted dates of Howard's office visits with her treating physicians. *Id.* at 13–15, 29–32; *see also* Howard Response at 18–19. Howard also criticizes Dr. Sniger's report as "biased and unreliable on its face," contending that he relies "almost entirely on the surveillance video." Howard Response at 18. She further argues that because the RSS report is "unsigned," it is not credible. Howard Motion for Summary Judgment at 14–16, 30.

Hartford argues that its reliance upon two consulting physicians' and a neuropsychologist's independent conclusions that "Howard was capable of full-time work at or above the sedentary demand level required by her occupation" was reasonable. Hartford asserts that because the reviewing medical professionals considered the surveillance report and video, their opinions were entitled to more weight than those of the treating physicians and IME physician Dr. Hoffman, none of whom had had the benefit of considering Howard's observed activities. Hartford Motion for

---

**26.** Indeed, "[d]riving is a 'dangerous activity that requires the utmost focus.'" *Bloom,* 2013 WL 238838, at *8 (citation omitted); *see also Hillyer v. Hartford Life and Accident Ins. Co.,* No. 2:09–cv–00843–JHH, 2011 WL 925027, at *14 (N.D.Ala. Jan. 31, 2011) (claimant observed driving herself and a friend around town requiring the "utmost focus"); *DeLorenzo v. Hartford Life and Accident Ins. Co.,* No. 803CV2097T27MSS, 2006 WL 485119, at *8 (M.D.Fla.2006) (video surveillance showing claimant driving without difficulty negates claimant's assertion that he cannot drive due to side effects of narcotic medication).

**27.** Howard does not claim, nor is there any objective evidence in the record that, she was incapacitated in any way due to the multiple medications she has been taking for several years. *Compare Franklin v. Hartford Life Ins. Co.,* No. 8:07–cv–1400–T–23MAP, 2008 WL 5110836, at *13 (M.D.Fla. Nov. 25, 2008) (claimant and treating doctors assert pain medications cause cognitive deficits interfering with claimant's ability to practice medicine).

Summary Judgment at 33–34. Hartford also contends it was "correct" and reasonable to submit the surveillance report and video to its consulting physicians, and to rely on their impressions of Howard's physical activity. *Id.* at 29.

▮ The Court finds that Hartford acted reasonably in relying on the independent medical opinions, and in crediting those opinions over the opinions of Howard's doctors. *Blankenship,* 644 F.3d at 1356. Indeed, the Eleventh Circuit has specifically determined that a Plan administrator's "use of 'file' reviews by its independent doctors—instead of live, physical examinations" is not arbitrary and capricious, "particularly in the absence of other troubling evidence." *Id.* at 1357. " '[I]t is entirely appropriate for an administrator to rely on written reports of consultants who have done paper reviews of a claimant's medical records, even if those reports rebut the opinion of the treating physicians asserting claimant is disabled.' " *Giertz–Richardson,* 536 F.Supp.2d at 1291; *see also Watts v. BellSouth Telecomm., Inc.,* 218 Fed.Appx. 854, 856 (11th Cir.2007); *Moeller,* 2011 WL 7981954, at *8.

The reviewing health care professionals each considered extensive medical records generated by Howard's treating physicians, AR at H229–36; H1515–17, 1520–21, and recognized her physical limitations. Dr. Marion opined that Howard has the "ability to work at least at the light duty occupational level," with an unrestricted sitting requirement, *id.* at H1523, and recognized Howard's physical restrictions in relation to standing and walking (up to four hours a day); climbing (two flights of stairs occasionally); lifting and carrying (20 pounds occasionally and 10 pounds frequently); and occasional pushing, pulling, bending, squatting, twisting and upper extremity use (with left shoulder). *Id.* Likewise, Dr. Sniger recommended: "Lifting/carrying of 10 pounds occasionally; opportunity to change positions periodically; standing/walking occasionally; no climbing, squatting or crawling. No other restrictions are indicated." *Id.* at H240.

That the reviewing health care providers may not have received every treating physician's report or reported inconsistent dates of office visits; did not have the benefit of Howard's minor corrections to her June 30, 2006 Disability Statement or Howard's explanation of her conduct in the surveillance video, (which consisted primarily of her saying that the distance driving was occasioned by a family emergency and that the errands took place on a "good day"), are not the type irregularities that create "procedural unreasonableness" sufficient to recast Hartford's reliance upon the consulting professionals' opinions as being arbitrary and capricious. *See Blankenship,* 644 F.3d at 1357. Moreover, there is no evidence either in the Administrative Record, or presented extrinsically, that suggests that the "unsigned" report was in anyway falsified or irregular, and thus should not be considered.[28] Moreover, nothing in the Administrative Record (or proffered by Howard) establishes that the reports provided by the reviewing health care providers were tainted by bias or conflict of interest.[29]

---

**28.** Howard's citation to inapplicable Social Security regulations is inopposite.

**29.** Even if the Court were to consider extrinsic evidence submitted by Howard showing that the consulting firms for whom Drs. Sniger, Marion and Walker worked routinely performed independent medical reviews and assessments of Hartford claim decisions and were paid for their work, such evidence has *"no* inherent probative value on the issue of whether these doctors were biased reviewers." *Harvey,* 850 F.Supp.2d at 1289 (emphasis in original). Nothing about any payment for their work reviewing medical records for Hartford is case-specific to Howard's claim for benefits, and establishes that the reviewers reached bias or improper conclusions after

Additionally, Hartford's decision to not order more testing in the form of another independent medical examination (IME) or functional capacity examination (FCE) in connection with its review of Howard's appeal of its termination decision, does not render its ultimate LTD benefits decision unreasonable or arbitrary and capricious, as Howard suggests. Hartford was not required by the Plan or the precepts of ERISA to obtain an IME or an FCE to rebut the opinions of Howard's treating physicians. *Hufford,* 322 F.Supp.2d at 1359. Hartford possessed substantial evidence that Howard was capable of performing her occupation, based on Howard's medical records, the opinions of its reviewing professionals, and the surveillance report and tapes. The burden to prove her disability rested with Howard; Hartford was under no obligation to order an IME or FCE examination in conjunction with her appeal. *See Townsend,* 295 Fed.Appx. at 978. In conclusion, Hartford was not wrong or unreasonable to rely on the opinions of two reviewing physicians and a neuropsychologist, and to afford less weight to the opinions of Howard's treating physicians that she was unable to work at her profession. *See Ray,* 443 Fed.Appx. at 533; *Brannon v. BellSouth Telecomm., Inc.,* 318 Fed.Appx. 767, 772 (11th Cir. 2009).

**D. Surveillance**

■ Howard contends that Hartford was wrong and unreasonable to rely on surveillance in determining that Howard was not disabled under the Plan, because the surveillance and accompanying video do not support a conclusion that Howard "is no longer prevented from performing *one or more* of the essential duties of her occupation." Howard Motion for Summary

Judgment at 12–13 (emphasis in original), 32; *see also* Howard Response at 14–17. She argues that surveillance observed her "using a cane at times," which is consistent with her infirmities, and that Howard explained to Hartford that her activities, including driving to Titusville and back in a day and carrying a walker, "were atypical, as she was dealing with a family emergency." She argues that "although she can engage in activity, it aggravates her pain and she cannot sustain the activity." Howard Motion for Summary Judgment at 12–13. Additionally, Howard argues that the surveillance video does not show when Howard is at rest, nor does it report the level of pain that Howard experiences. *Id.* at 33.

Hartford responds that surveillance is appropriate and reasonable, and that the "video showed Howard clearly exceeding the limitations that she described to Hartford … and to her treating physicians, thus discrediting the subjective self-reporting and resulting medical opinions upon which her LTD claim depended." Hartford Motion for Summary Judgment at 22. Hartford points specifically to the surveillance observations establishing Howard's ability to drive; to use her hands (hold and talk on a cell phone, pump gas, carry bags and a purse, carry a cane, try on shoes, hold a steering wheel for two or more hours, turn a steering wheel with one hand while holding a cell phone with the other, open and close the door on her vehicle and at the bank, and lift and carry a walker), sit for extended periods of time, stand, walk, (while shopping for more than an hour), lift, reach, bend, and enjoy a normal range of motion. *Id.* at 24–28.

■ Howard's citation to other cases in which Hartford's surveillance video did not

reviewing Howard's medical records, and the surveillance tape of her activities. *See also*

*Harvey,* 503 Fed.Appx. at 849–50.

support a denial of benefits is unavailing. The use of video surveillance to document a claimant's functional capacity is appropriate under ERISA. The Eleventh Circuit has specifically recognized that surveillance video may be properly considered by a plan administrator in denying benefits to a claimant. *See Gipson,* 350 Fed.Appx. at 392–93 (affirming summary judgment in favor of administrator, based in part on administrator's review of surveillance showing claimant who asserted disability based upon fibromyalgia, depression and headaches, driving, walking with normal gait, shopping, and carrying shopping bags); *Ruple v. Hartford Life and Accident Ins. Co.,* 340 Fed.Appx. 604, 608, 614 (11th Cir.2009) (administrator was not wrong to terminate participant's disability benefits where disability claimant reporting back pain was observed on two instances "driving around town on errands and ambulating normally"); *Turner,* 291 F.3d at 1274 (holding that administrator's termination of disability benefits was not arbitrary and capricious and recounting two days of surveillance in which claimant was observed walking "in a fluid manner" into a bank and a doctor's office without any visible restrictions or medical devices, and on the second day, driving to a mall and shopping for two hours; plan was "entitled to rely on the opinion of the independent medical examiner … in light of the surveillance report"); *Ray v. Sun Life & Health Ins. Co.,* 752 F.Supp.2d 1229, 1247–48 (N.D.Ala.2010) (affirming administrator's termination based upon surveillance report showing plaintiff who claimed to a heart condition, on a seven-hour shopping trip and running errands, and driving to three locations on the next day, because the "objective evidence" contradicted his claimed physical limitations), *aff'd* 443 Fed. Appx. 529 (11th Cir.2011) (noting that two non-examining medical experts who reviewed claimant's medical history and surveillance tapes opined that claimant was capable of returning to her own occupation), *cert. denied,* —— U.S. ——, 133 S.Ct. 547, 184 L.Ed.2d 343 (2012); *see also Hillyer,* 2011 WL 925027, at *5–6, *14, *15, *17; *Cusumano,* 2008 WL 1711405, at *8; *DeLorenzo,* 2006 WL 485119, at *8; *Kiloh v. Hartford Life Ins. Co.,* No. 8:04CV174T24TGW, 2005 WL 2105957, at *11 (M.D.Fla. Aug. 31, 2005).

Of course, the determination of whether surveillance is truly probative of whether the claimant qualifies for disability benefits is heavily based on case-specific factors. Hartford's investigator observed Howard on day-long outings, sitting for extended periods of time, focusing on driving, shopping, and performing other normal physical and cognitive activities. Spanning nearly 21 hours of activity away from home during a period of six days, the surveillance in this case provided more than "mere snapshot" of Howard's activities throughout the day. *Compare Cross v. Metro. Life Ins. Co.,* 292 Fed.Appx. 888, 892–94 (11th Cir.2008) (five days of surveillance resulted in only two hours of video that did not show the claimant exerting himself "and did nothing to disprove his reports of pain"); *Franklin v. Hartford Life Ins. Co.,* No. 8:07–cv–1400–T–23MAP, 2008 WL 5110836, at *12–13 (M.D.Fla. Nov. 25, 2008) (surveillance spanning seven days and producing 20 hours of video showing claimant's limited abilities to walk, drive, and get in and out of car offers no proof claimant disabled by rheumatoid arthritis, osteoarthritis and herniated disc, can work as a physician practicing medicine, and is consistent with claimant's explanations of his limitations). Importantly, the investigator's observations, and the accompanying surveillance video, directly contradicts Howard's repeated assertions that she could not walk, drive, sit, reach, bend, talk on the phone for extended periods, lift, focus, or concentrate. Howard's credibility is seriously called into question

by the surveillance video which shows her engaging in activities grossly inconsistent with her description of her abilities, and in stark contrast to her own treating physicians' assessments, which were based on Howard's subjective complaints. As such, the Court finds that the surveillance report and video evidence in this case is material, probative evidence, and that Hartford was entitled to rely on it in assessing the credibility of Howard's subjective complaints of pain and the weight of the treating physicians' reports and opinions based upon those complaints. Additionally, it was neither wrong nor unreasonable for Hartford to submit Howard's medical history and the surveillance video to the independent reviewing health care professionals for their review. *Schindler v. Metro. Life Ins. Co.*, 141 F.Supp.2d 1073, 1081 (M.D.Fla.2001).[30]

### E. *Conflict of Interest*

■ Howard argues that Hartford's "conflict of interest has infected its claims administration," Howard Motion for Summary Judgment at 17, and that Hartford's decision to terminate Howard's LTD benefits "was actually motivated by its financial self-interest." Howard Response at 2. She contends that the fact that the monetary value of Howard's disability claim appeared in the Administrative Record, and was available to Hartford's claims analysts and reviewing health care professionals, is evidence that Hartford's financial interest in denying Howard LTD benefits played into its decision to re-evaluate Howard's claim, and colored its final determination. Howard Motion for Summary Judgment at 17–18, 21–22. Additionally, Howard contends that Hartford's failure to schedule a second IME, rather than launching into an

investigation and surveillance is further evidence of its unreasonable bias. *Id.* at 26–29. Because Hartford both determines and pays benefits under the Plan, the Court must consider the inherent structural conflict of interest in this case as a factor in determining whether the Hartford Plan administrator abused its discretion in terminating Howard's LTD benefits. *Glenn,* 554 U.S. at 108, 128 S.Ct. 2343; *Blankenship,* 644 F.3d at 1355.

Howard argues specifically that the fact that Hartford employees were informed of Hartford's profitability, and that they received bonuses and compensation in the form of stock, also contributes to establishing that Hartford's conflict of interest rendered its decision to terminate Howard's LTD benefits arbitrary and capricious. Additionally, Howard contends that the fact that the third party "vendors" who employed Hartford's medical "reviewers" earned a significant income from their business with Hartford establishes that a financial conflict of interest created an incentive for these reviewers to find Howard was not disabled, with "no safeguards" set up by Hartford to prevent a biased finding. Howard Motion for Summary Judgment at 18–26, 32; Howard Response at 15. The Court declines to accept these arguments. Howard cites to extrinsic evidence in the form of deposition testimony, Hartford corporate compensation policy documents, the testimony of a former Hartford claims adjustor from Georgia who had nothing to do with this case, and responses from third party vendors regarding income. Not only does this constitute extrinsic evidence that was not before the Administrator at the time of the decision, but it also is not case-

---

**30.** Likewise, Hartford's decision to reinitiate surveillance after the first three days in March and April 2006, does not amount to an abuse of discretion. *See generally Bloom,* 917 F.Supp.2d at 1286–87, 2013 WL 238838, at *14 (administrator's failure to take prior steps to investigate claimant before employing surveillance is not an abuse of discretion).

specific evidence that Hartford's or the third-party vendors' compensation structure in any way influenced Hartford's decision in this case. Indeed, the fact that Hartford consulted three separate outside health care professionals to review Howard's medical records, and sought comment from Howard's treating physicians about the surveillance videos may be considered as evidence that it mitigated, and was not influenced by its structural conflict of interest. *See Keith,* 347 Fed.Appx. at 552; *Moeller,* 2011 WL at 7981954, at *11; *McCay v. Drummond Co.,* 823 F.Supp.2d 1221, 1246 (N.D.Ala.2011).

The financial conflicts of interest about which Howard complains, in the form company profitability, employee compensation and bonuses, and administrator payment to reviewing health care providers, are "an unremarkable fact in today's marketplace." *Blankenship,* 644 F.3d at 1356. Indeed, even the high value of Howard's claim and the fact that it was reported in her claim file, is not sufficient to transform Hartford's decision into being arbitrary and capricious. *See id.* at 1357 (rejecting the district court's finding that the $510,000 value of claimant's potential claim skewed the plan administrator's decision). Likewise, there is no evidence that Drs. Sniger, Marion, and Walker were biased. "The use of independent reviewers is a practice recognized by the Eleventh Circuit as reasonable and does not automatically evince a conflict of interest." *McCay,* 823 F.Supp.2d at 1246. Nor has Howard established that Hartford's procedural handling of Howard's claim for LTD benefits was faulty. *See Bloom,* 917 F.Supp.2d at 1286, 2013 WL 238838, at *14 (court examined and rejected the claimant's contention

that alleged "procedural violations substantially impacted Hartford's determination of Bloom's claim such that she did not receive a full and fair review and Hartford abused its discretion in terminating her benefits"); *compare Helms v. Gen. Dynamics Corp.,* 222 Fed.Appx. 821, 828–29, 834 (11th Cir.2007) (administrator never submitted claimant's medical evidence to peer review nor conducted an IME on claimant, rendering procedural handling of claim flawed, wrong and unreasonable).[31]

▬▬ "Where a conflict exists and a court must reach step six, 'the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest.' " *Blankenship,* 644 F.3d at 1355; *see also Ray,* 443 Fed. Appx. at 529. The court must weigh the structural conflict of interest as a factor during the arbitrary and capricious review. *Doyle,* 542 F.3d at 1355. The effect a conflict of interest will have on review of a benefits determination "will vary according to the severity of the conflict and the nature of the case." *Blankenship,* 644 F.3d at 1355. However, "[e]ven where a conflict of interest exists, courts still 'owe deference' to the plan administrator's 'discretionary decision-making' as a whole," both as to an administrator's plan interpretations and his factual determinations. *Id.* at 1355 & n. 6. Howard has not met her burden of establishing "persuasive indicators" that conflict so tainted Hartford's decision so as to render it arbitrary and capricious. *See Harvey,* 850 F.Supp.2d at 1292; *see also e.g. Prater v. Health and Welfare Plan for Emp. of Fla. Power and Light Group, Inc.,* No. 6:10–CV–194–

---

**31.** The Court also concludes that procedural irregularities alleged by Howard were, if they indeed existed, *"de minimus* in nature" and did not impact Hartford's full and fair review of Howard's claims, in that Howard "did not demonstrate that these procedural violations

amounted to a conflict of interest with 'sufficient inherent or case-specific importance.' " *Bloom,* 917 F.Supp.2d at 1288, 2013 WL 238838, at *16 (quoting *Blankenship,* 644 F.3d at 1357).

**1302**

ORL–36DAB, 2012 WL 1059785, at *8 (M.D.Fla. March 28, 2012) ("[t]here is nothing in the totality of circumstances that indicates that Defendant's conflict of interest was a major factor in its decision"); *Pinto*, 2011 WL 536443, at *13 (same). Giving deference to the Hartford administrator, as the Court must, and observing that the Hartford administrator's termination decision was entirely reasonable based upon the record before it, the Court concludes that Howard has not established that the structural conflict of interest in this case "had sufficient 'inherent or case-specific importance'" warranting reversal of Hartford's benefits decision as arbitrary and capricious. *Blankenship*, 644 F.3d at 1357.

### *Conclusion*

Hartford considered the medical information submitted by Howard's treating physicians, 21 hours of activity during six days of surveillance, and three hours and fourteen minutes of surveillance video, Howard's own report of impairment which was significantly contradicted by the surveillance, and the opinions of three independent reviewing health care professionals (including two physicians), who reviewed Howard's treating physicians' health care records as well as the surveillance video, to conclude that Howard had failed to make a sufficient showing of disability under the Plan. *See Blankenship*, 644 F.3d at 1356. Giving deference to the administrator's discretionary decision, and taking into account the existence of Hartford's structural conflict of interest, the Court cannot say that Hartford unreasonably terminated Howard's LTD benefits, or acted arbitrarily and capaciously. *See Doyle*, 542 F.3d at 1363.

Accordingly, it is hereby

**ORDERED:**

1. Defendant Hartford Life & Accident Company's ("Hartford") Dispositive Motion For Summary Judgment With Statement Of Undisputed Material Facts And Memorandum Of Law in Support Thereof (Doc. 208) is **GRANTED.**

2. Plaintiff's Dispositive Motion For Summary Judgment (Doc. 219) is **DENIED.**

3. Defendant's Motion To Strike Exhibits To Plaintiff's Motion For Summary Judgment, With Memorandum Of Law In Support Thereof (Doc. 221), which the Court construes as a Motion in Limine, is **GRANTED.**

4. Plaintiff's Motion In Limine To Exclude Extra Record Evidence Attacking The Character Of Plaintiff's Witness, Sandra Carter, In Dispositive Motion Briefings (Doc. 211) is **DENIED as MOOT.**

5. The Clerk is directed to terminate all pending motions and deadlines as moot and to close the file.